THE PEOPLE *ex rel.* Walter E. Dwight, Appellee, *vs.* THE CHICAGO RAILWAYS COMPANY *et al.*—(THE CHICAGO AND WEST TOWNS RAILWAY COMPANY, Appellant.)

*Opinion filed October 27, 1915—Rehearing denied Dec. 8, 1915.*

1. STREET RAILWAYS—*effect of annexation upon street railway ordinance.* Upon annexation of a town to a city, ordinances of the town providing for the construction, maintenance and operation of a street railway, which ordinances have been accepted by the company, remain in force, but the city, with the consent of the company, may change the ordinances or make entirely new ones, as the jurisdiction of the town over the company ceases when it loses jurisdiction over the streets and alleys in the territory annexed to the city.

2. SAME—*one municipality cannot regulate street railways in another.* An attempt by a village to regulate by ordinance the affairs of a street railway company whose lines are in an adjoining city, by requiring a company operating within the jurisdiction of the village to exchange transfers with the city lines, is beyond its power and void and can only be enforced with the consent of the city, as the latter's jurisdiction over its own streets and alleys, and street railway lines operating thereon, is absolute.

3. SAME—*object of the Chicago ordinances concerning the Chicago Railways Company.* The object of the ordinances of the city of Chicago concerning the Chicago Railways Company was to bring all the lines of street railway, as nearly as possible and as soon as possible, into one homogeneous system, operating under a single control and a single ordinance or substantially similar ordinances, and the questions of rates of fare, through routes, exchange of transfers, a single fare for one ride in the city, the making of operating agreements and the expiration of ordinance rights were all considered and provided for with direct reference to producing uniform operation within the city.

4. SAME—*section 8 of the ordinance of 1913 prohibits exchange of transfers with outside lines.* Section 8 of the Chicago ordinance of 1913 expressly prohibits the exchange of transfers between the Chicago Railways Company and street railway lines outside the limits of the city; and such must be regarded as the effect of said section 8, notwithstanding the statement in the proviso thereto that the section is not intended to change the ordinances of 1907 and 1910.

5. SAME—*when ordinance does not deprive public or individual of any legal right.* The power of a municipality to regulate the

rate of fare of a street railway company is dependent upon the jurisdiction of the municipality over its streets and alleys and is subject to a transfer of jurisdiction of the streets to another municipality, and the abrogation of a contract between the municipality and a street railway company by repeal or modification of the ordinance does not deprive the public or any individual of any legal or constitutional right.

6. ORDINANCES—*order of clauses is not conclusive of legislative intent.* The fact that the proviso is the last clause in a section of an ordinance does not mean that it must prevail as the last expression of the legislative intent, as an ordinance is regarded as a whole, whose parts are all established at one time, and if a preceding clause or section conforms to the obvious policy and intent of the legislative body it is not rendered inoperative by inconsistent provisions of a subsequent clause or section, and in such case the subsequent provisions will be disregarded.

7. MANDAMUS—*mandamus will not issue to compel corporation to do what it has no power to do.* Mandamus will not be granted at the suit of a village to compel a street railway company within its territorial jurisdiction to do an act which it is apparent is beyond the power of the company to do, even though the company has accepted an ordinance of the village which imposes that duty upon it.

APPEAL from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

McEWEN, WEISSENBACH, SHRIMSKI & MELOAN, (WILLARD M. McEWEN, and ISRAEL SHRIMSKI, of counsel,) for appellant.

WILLIAM R. MOSS, and B. F. LANGWORTHY, (S. S. GREGORY, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

A petition was filed by Walter E. Dwight, a citizen and resident of the village of Oak Park and the president of the village, against the County Traction Company and the Chicago Railways Company, for the purpose of obtaining a writ of *mandamus* compelling these railway companies to carry passengers in either direction between the terminals

of the Chicago Railways Company in the city of Chicago and any point on the street railway lines in Oak Park for a single fare of five cents. The city of Chicago was afterward also joined as a defendant. During the pendency of the proceedings the name of the County Traction Company was changed to the Chicago and West Towns Railway Company. The suit resulted in a judgment awarding the writ against the Chicago and West Towns Railway Company but denying it so far as the Chicago Railways Company and the city of Chicago are concerned. This appeal is prosecuted by the Chicago and West Towns Railway Company directly to this court on the ground that the validity of certain ordinances of the village of Oak Park and the city of Chicago is involved, the court having certified that the public interest so requires. A writ of error was also sued out of this court by the People to reverse the judgment in favor of the Chicago Railways Company and the city of Chicago, and that judgment has been affirmed. *People* v. *Chicago Railways Co.* (*ante*, p. 87.)

The obligation so to carry passengers is based by the petitioner upon an ordinance of the village of Oak Park passed on June 4, 1903, amending an ordinance of the town of Cicero passed on December 19, 1898, relating to the Cicero and Proviso Street Railway Company. The Cicero and Proviso Street Railway Company before 1898 had constructed and was operating lines of street railway in the town of Cicero, and in that year the ordinance of December 19, 1898, was passed, granting the company a fifty-year extension of its existing rights in certain streets. The town of Cicero lay immediately west of the city of Chicago and included the territory which was annexed to the city of Chicago on April 8, 1899, under the name of Austin, as well as the territory of the village of Oak Park. Since the annexation of Austin to the city of Chicago the west boundary line of the city is Austin avenue, or Sixtieth avenue. The village of Oak Park was created No-

vember 5, 1901, and includes the territory lying immediately west of Austin between North avenue on the north and Twelfth street on the south, Sixtieth avenue on the east and Seventy-second avenue on the west, all of which was formerly a part of the town of Cicero.

The ordinance of the village of Oak Park passed June 4, 1903, provided that the rate of fare for passengers riding in one direction between Seventy-second avenue, (the western boundary line of Oak Park,) the terminal points of the Cicero and Proviso Street Railway Company in Oak Park, and the eastern terminal points of the Union Traction Company in Chicago, which eastern terminal points should be in that district bounded on the north by the Chicago river, on the west by the south branch of the river, on the south by VanBuren street and on the east by Lake Michigan, should be five cents, and that the fare should include the right to ride in either direction over and along certain defined routes, with transfer privileges on any north and south connecting line within the limits of the village and the city of Chicago, wherever such connecting line might be located between the termini of said routes, in the same manner as transfers were given to passengers upon the lines of the Union Traction Company within the limits of the city of Chicago, and the same universal transfer privileges to passengers from the village of Oak Park as were extended to Chicago passengers upon the lines of the Union Traction Company within the city of Chicago. It was further provided that if the Cicero and Proviso Street Railway Company should fail to transport, or cause to be transported, passengers over the lines of railway mentioned, as provided in the amended ordinance, such amended ordinance, at the election of the trustees of the village, should become void. The ordinance provided that it should become effective upon its acceptance by the Chicago Consolidated Traction Company, successor to the Cicero and Proviso Street Railway Company, and required a bond to be

given by the Consolidated Company for the faithful performance by the Cicero and Proviso Street Railway Company of its obligations under the ordinance. This bond was given and the ordinance accepted by the Consolidated Company.

At the time of the passage of this ordinance the Chicago Consolidated Traction Company was operating various railway lines in the village of Oak Park as well as in the city of Chicago, and that company and the Union Traction Company exchanged transfers at the points indicated in the ordinance in the city of Chicago, for travel upon the particular routes indicated in the ordinance. Under this arrangement passengers were able to ride back and forth between the village of Oak Park and the loop district in the city of Chicago for a fare of five cents. This method of transportation continued until midnight of December 27, 1910, when it was discontinued, the exchange of transfers ceased, and passengers between the city and the village, in either direction, have since been obliged to transfer at the city limits and pay an additional fare.

It is contended by the relator that when the Oak Park ordinance was passed and accepted the Chicago Consolidated Traction Company and the Chicago Union Traction Company were virtually one company, and that the Chicago Union Traction Company was bound by the terms of the ordinance to the same extent as the Chicago Consolidated Traction Company. The relations existing between the Chicago Union Traction Company and the Chicago Consolidated Traction Company out of which it is claimed the liability of the Chicago Union Traction Company grew, are stated in the opinion in the case of *Chicago Union Traction Co.* v. *City of Chicago,* 199 Ill. 579. We held in that case that the Union Traction Company, upon the facts appearing there, which are the same as the facts appearing here, was the beneficial owner of the Chicago Consolidated Traction Company, and that the lines of railway

of the latter company and those of the Chicago Union Traction Company were within the terms of section 1723 of the Chicago city ordinances, which required an exchange of transfers by the street railways owned or used and operated by the same persons.

On April 22, 1903, a bill was filed in the United States circuit court against the Chicago Union Traction Company under which receivers of that company were appointed, who operated its lines of railway and managed and controlled all its affairs from that time until the sale of the property under a decree of foreclosure rendered December 26, 1907, and its delivery to the Chicago Railways Company on January 29, 1908. During this time the receivers of the Chicago Union Traction Company and the Chicago Consolidated Traction Company continued to exchange transfers for traffic between Oak Park and Chicago as the two traction companies had done before the appointment of the receivers. The Chicago Railways Company became the purchaser of all the property of the Chicago Union Traction Company, and after coming into possession of the property continued to operate the lines of railway and manage and control the business and to exchange transfers with the Chicago Consolidated Traction Company as before.

A bill was filed against the Chicago Consolidated Traction Company in the United States court in Chicago under which receivers of that company were appointed on June 25, 1908, who operated its lines of railway from that time until their sale under a decree of foreclosure rendered October 6, 1910, and their conveyance and delivery to the assigns of the purchaser on December 27, 1910. During this time the receivers and the Chicago Railways Company exchanged transfers as the Railways Company and the Consolidated Company had done before the receivers for the latter company were appointed. The lines which were owned and operated directly by the Chicago Railways Company were wholly within the limits of the city of Chicago

and did not extend west toward Oak Park beyond Fortieth avenue and Forty-eighth avenue, respectively, while the west boundary of the city was Sixtieth avenue. At these terminals in Fortieth and Forty-eighth avenues connection was made with the lines of the Consolidated Company extending into and through Oak Park.

On November 30, 1910, Andrew Cooke became the purchaser of all the lines of the Chicago Consolidated Traction Company at the sale made under the decree of October 6, 1910, and on his petition, under an order of the court, a deed was made by the master of all the lines of the Consolidated Company lying within the city of Chicago to the Chicago Railways Company, and another of all the lines of the Consolidated Company lying outside the city of Chicago to the County Traction Company. The County Traction Company thus became the owner of all the street railway lines in the village of Oak Park which the Consolidated Company had owned, and the Chicago Railways Company became the owner of all the lines of the Consolidated Company in the city of Chicago.

It is the position of the counsel for the relator that the relations of the Consolidated Company and the Union Traction Company were such that the Consolidated Company was really merged into and was a part of the Union Traction Company, and that by the acceptance of the ordinance by the Consolidated Company and the furnishing of the service required by the ordinance for many years by the Consolidated Company, the Union Traction Company and its receivers and the Chicago Railways Company, the obligation to continue the service has become fixed on the Chicago Railways Company.

By the acceptance of the ordinance of the town of Cicero passed December 19, 1898, a contract was created between the town of Cicero in its governmental capacity, and the street railway company, for the construction, maintenance and operation of lines of street railway in the town

of Cicero in accordance with the terms of the ordinance. When the territory known as Austin was annexed to Chicago, in April, 1899, jurisdiction over the streets and alleys in that territory vested immediately in the city of Chicago, and the town of Cicero had no longer any control over such streets and alleys or of the construction, operation and maintenance of the street railways in them. Neither the city of Chicago nor the street railway company could repudiate the contract, but the town of Cicero had no longer any power or control over the streets and alleys. That power and control belonged absolutely to the city of Chicago, which had the right, with the consent of the railway company, to change the contract or make an entirely new contract, to impose other or additional conditions upon which the company should thereafter use the streets and alleys in that territory, or to relieve the company entirely from the performance of the conditions attached to the grant by the town of Cicero of the use of the streets in the territory by the company. *People* v. *Chicago Telephone Co.* 245 Ill. 121.

The amendment of the ordinance, after the creation of the village of Oak Park, by the ordinance of June 4, 1903, created a contract between the village of Oak Park in its governmental capacity, and the Consolidated Company, for the construction, maintenance and operation of lines of street railway in the village of Oak Park in accordance with the terms of the ordinance. It conferred no rights and imposed no duties in regard to lines of street railway in the city of Chicago, for the village of Oak Park had no jurisdiction or control over such lines. The obligation of the Consolidated Company, so far as it affected those lines, was merely a personal undertaking, whose performance was entirely subject to the consent and control of the city of Chicago. If that contract is regarded as binding on the Union Traction Company and the Chicago Railways Company, still it can be performed only with the consent of

the city of Chicago, which has the right to control the op-. eration of street railways within its limits.

The only authority of the Chicago Railways Company for the operation and maintenance of street railways in the city of Chicago is the ordinance of February 11, 1907, the ordinance of October 10, 1910, and other supplementary ordinances. The ordinance of February 11, 1907, was accepted by the Railways Company on January 29, 1908. All the lines mentioned in any of these ordinances are wholly within the city of Chicago. They connected with the lines of the Consolidated Company, and section 24 of · the ordinance of February 11, 1907, made specific provision as to the exchange of transfers with these lines. That provision required the same right of transfer of passengers between the lines of the Railways Company and the connecting lines of the Consolidated Company for a continuous ride in one general direction for a single fare within the limits of the city, as if the lines of the Railways Company and the Consolidated Company were owned and operated by the Railways Company under the provisions of the ordinance, but such right was to cease as to any particular line of said Consolidated Company upon the expiration of the right of said company to operate said line under ordinances theretofore passed. Transfers were exchanged, and under this provision their exchange was required. Such exchange resulted in the compliance by the Consolidated Company, and afterwards by its receivers, with the obligation of the Oak Park ordinance.

On October 10, 1910, an ordinance of the city of Chicago was passed requiring the Chicago Railways Company to construct, maintain and operate certain extensions of and additions to its lines of street railway under and in accordance with the provisions of the ordinance of February 11, 1907, in all respects as though the right to construct, equip, maintain and operate the same had been granted by the ordinance of February 11, 1907, and for that purpose

the Railways Company was authorized to acquire all, and not a part, except as thereinafter provided, of the street railway property at that date located in said streets and belonging to or claimed by the Consolidated Company or its receivers. The Chicago Railways Company, upon its acceptance of this ordinance, was required to proceed at once to reconstruct and equip the extensions and additions authorized by the ordinance and at all times to maintain and operate them in full compliance with the ordinance of February 11, 1907, except in so far as modified by the ordinance of October 10, 1910. The ordinance stated that its passage was based upon the assumption that the Chicago Railways Company, within four months after its passage, should acquire the lines of railway of the Consolidated Company within the city free and clear of all liens and claims of every description, including the release and waiver of all and every one of the rights and claims, of every kind and nature, in respect to the location, maintenance and operation of street railways in the streets of the city, vested in or claimed to belong to the Consolidated Company or any of its underlying companies. This ordinance was accepted by the Chicago Railways Company on December 6, 1910, and on December 27, 1910, the conveyance was made to the Railways Company of all the lines of street railway of the Consolidated Company within the city limits, free and clear of all liens and claims of every description, in accordance with the terms of the ordinance. At the same time the Chicago Railways Company delivered to the city of Chicago a release, waiver and extinguishment of the rights and claims, of every kind and nature, in respect to the location, maintenance or operation of street railways in the streets of the city, vested in or claimed to belong to the Chicago Consolidated Traction Company or any of its underlying companies. Possession was immediately taken of this property by the Railways Company, which has ever since been continuously in the exclusive

possession and operation of all of said lines of street railway within the limits of the city of Chicago.

Section 11 of the ordinance of 1907 provided that the company should be entitled to charge passengers the sum of five cents for each passenger twelve years of age or over for a continuous trip in one general direction, within the present or future limits of the city, over its lines covered by the ordinance and all extensions, whether owned, leased or operated by it, or any other line operated by any other corporation from which the Railways Company was by the ordinance obliged to accept transfers, and provided for the exchange of transfers with all existing street car lines in the city after such time as the several franchises of such existing lines should have expired and should have been extended or renewed. Section 13 provided for a number of through routes over lines other than those of the Railways Company, and to carry them out required the making of reasonable operating agreements, to be approved by the board of engineers, whenever required by the city, and provided that if the companies were unable to agree on terms within sixty days after the passage of the ordinance, the board of engineers should fix the basis between the corporations, and it should be their duty to establish the terms fixed. Section 12 provided that no pass of any kind should be issued or given to any person, and that no person, except the employees of the city, policemen and firemen in full uniform, should be permitted to ride on said street railway without the payment of fare, except that the Railways Company might issue to its employees free tickets for use while engaged in the performance of their duties and might permit them to ride free when wearing an official badge of the company, and that the company should keep a record of the number of such free tickets and to whom issued, and under certain conditions the Railways Company should carry United States letter carriers in full uniform without the payment of fare. The ordinance pro-

vided for an annual accounting and settlement between the company and the city, and the division of the net receipts from the operation of the street railway system, ascertained in the manner provided by the ordinance, forty-five per cent to the company and fifty-five per cent to the city. Provision was also made for the purchase of the whole street railway system by the city, at its option, upon notice and terms and in the manner provided in the ordinance. The ordinance declared the purpose and desire of the city to provide for the unified operation and the comprehensive reconstruction of all the street railways within the city, and at the same time a similar ordinance was passed in regard to the Chicago City Railway Company and its tributary or associated companies operating street railways in the south division of the city.

Clearly the city council intended by the passage of these ordinances to bring all the lines of street railway, as nearly as possible and as soon as possible, into one homogeneous system, operating under a single ordinance or substantially similar ordinances, and a single control. The questions of rates of fare, through routes, a single fare for one ride in the city, the exchange of transfers, the existence of operating agreements and the expiration of ordinance rights were all considered and provided for with direct reference to producing uniform operation within the city.

The appellant claims that by this ordinance the city assumed entire control of the subject matter of transfers, and impliedly prohibited the exchange of transfers between the lines of the Chicago Railways Company within the city and street railway lines outside the city, or the carriage of any passenger without the payment of a five cent cash fare. Whether or not this is the correct interpretation of that ordinance we do not find it necessary to consider by reason of the subsequent action of the city council.

On March 18, 1913, during the pendency of this suit, the city council of the city of Chicago passed an ordinance

270 — 19

authorizing the Chicago Railways Company to enter into a lease or operating agreement with the County Traction Company, whereby the Railways Company should be permitted to operate its cars over the south track in Twelfth street, between South Forty-sixth avenue and South Sixtieth avenue, parallel to and south of the other track on Twelfth street which belonged to the Railways Company. The center of Twelfth street was here the dividing line between the city of Chicago and the town of Cicero. The town of Cicero passed an ordinance authorizing the County Traction Company to make the lease and the Railways Company accepted the ordinance of the city of Chicago. Section 8 of the ordinance is as follows:

"Sec. 8. The consent, permission and authority hereby granted are so granted upon the express condition that the Chicago Railways Company shall not carry on any of its lines of railway in the city of Chicago, or on any line authorized to be operated hereunder, without the payment of a cash fare to it, as provided by the ordinance of February 11, 1907, herein referred to, any passenger presenting a transfer issued on any line of street railway outside the limits of the city of Chicago, or carry any passenger over its said lines who has not paid a cash fare to it on any transfer or transfers issued on any other lines of street railway, except such transfers as are expressly provided for and authorized by the said ordinance of February 11, 1907, or the amendatory ordinance of October 10, 1910. Nor shall said Chicago Railways Company issue to any passengers transported on its lines within said city or on the lines authorized to be operated hereunder, any transfers entitling such passengers to be carried on any other lines of street railway except such transfers as are expressly provided for and authorized by said ordinance of February 11, 1907, or said amendatory ordinance, and the aforesaid resolution or ordinance of the board of trustees of the town of Cicero shall expressly recite this provision of this ordi-

nance: *Provided, however,* that it is not intended hereby
to change, add to or detract from the said ordinances of
February 11, 1907, and October 10, 1910, except as there-
in and thereby provided."

On its face this section by its terms prohibits the ex-
change of transfers sought to be compelled in this case.
It has no other purpose and the proviso can have no other
meaning than that such prohibition was what the ordi-
nances of 1907 and 1910 meant. If this was the meaning
of those ordinances that is the end of the matter. The
appellee, however, contends that the ordinances of 1907
and 1910 did not prohibit the exchange of transfers, and
since the proviso expressly declares that it is not intended
to change, add to or detract from those ordinances except
as therein and thereby provided, there is no such prohibi-
tion. This proviso seems wholly meaningless. It declares
that the ordinances are not intended to be changed except
as provided in the ordinances themselves. This language
expresses no comprehensible idea. Assuming that the
previous ordinance did not prohibit the use of transfers,
there is no doubt that the language of section 8 of the
ordinance of 1913 does expressly prohibit the Chicago Rail-
ways Company from carrying, without the payment of a
cash fare, any passenger presenting a transfer issued on
any line of street railway outside the city of Chicago or
on any other line of street railway except such transfers
as were expressly authorized by the ordinances of 1907
and 1910, and from issuing any transfers to any other
lines of street railway except such as were expressly au-
thorized by those ordinances. The language of the ordi-
nances of 1907 and 1910 had not been judicially construed
prior to the adoption of this section and its meaning may
have been thought open to construction. It may have been
supposed to mean, as counsel for the appellant contend it
does mean, that the carriage of passengers without the
payment of a cash fare and the issue and acceptance of

transfers is prohibited, and the proviso makes it clear that such was the understanding of the city council. There is no room for construction as to the meaning of section 8, which expressly prohibits the use of transfers, and since this is so there is no room to doubt that the intention of the proviso was to declare that such was the meaning of the previous ordinances. The object of the ordinance of March 18, 1913, was to authorize an operating agreement between a street railway within the city and one without the city. The regulation of transfers in such case was necessarily to be considered. No transfers were then in use between street railways within the city and those without the city. This subject was covered by section 8, which certainly did not mean to authorize transfers but by its language definitely prohibited them. Such prohibition was consistent with the previous course of the city. The ordinance of 1907 provided for transfers only within the city and in cases where they were required by previous operating agreements between companies. The efforts of the city had been directed to securing uniform operation of the street railways within the city, only, and section 8 was in entire conformity with this obvious policy of the city. The object of the proviso was not to repeal the purview of the section and entirely destroy the prohibition of transfers, and if it was so inconsistent with the other provisions of the ordinance as to produce this result it must give way to the evident intention manifested by the whole ordinance.

The object in the consideration of conflicting provisions in a legislative act is to ascertain the legislative intent. It is insisted that the proviso being the last clause in the section, added after the other provisions, must govern as the last expression of the legislative will. The mere order of arrangement is not, however, conclusive, or, indeed, very persuasive, of the legislative intent. The ordinance is to be regarded as a whole. Its parts are all established at one time and its conflicting provisions must be

reconciled by a consideration of the whole ordinance. An interpretation which renders the ordinance null and void cannot be admitted. It is an absurdity to suppose that after it is reduced to terms it means nothing. It ought to be interpreted in such a manner as that it may have effect and not be found vague and nugatory. When the first clause of a section conforms to the obvious policy and intent of the legislature, it is not rendered inoperative by inconsistent provisions in a later clause or section which do not conform to this policy and intent. In such case the later provision is nugatory and will be disregarded. The court, in construing the act, will be governed by the apparent purpose and obvious policy and intent of the legislative body as gathered from the whole act, even though a disregard of the later provision results. (*McCormick* v. *West Duluth,* 47 Minn. 272; *State* v. *Bates,* 96 id. 110; *Sams* v. *King,* 18 Fla. 557; *State* v. *Mulkem,* 74 Ohio St. 365; *Shutt* v. *State,* 173 Ind. 689.) It was the manifest purpose of the ordinance to prohibit the exchange of transfers between the Chicago Railways Company and street railways outside the limits of the city, and the proviso to section 8 does not defeat that purpose.

It is contended that the condition prohibiting the exchange of transfers is invalid. This claim is based upon the assumption that the Chicago Railways Company was under an obligation to establish and maintain a five cent fare between Oak Park and the loop district in Chicago by virtue of the Oak Park ordinance of June 4, 1903; that this was a public duty, and that any contract not to perform this public duty is void, as against public policy, unless consented to by the State. The argument seems to be completely answered in *People* v. *Chicago Telephone Co. supra,* where it was held that the power of a municipality to regulate the tolls of a telephone company occupying its streets was dependent upon the jurisdiction of the municipality over such streets and was necessarily subject to a

transfer of jurisdiction of the streets to another municipality. Neither the public nor any individual has any vested right under a contract between the municipality and a telephone company for the use of the public streets and alleys which may not be changed by the municipality with the consent of the company and without the consent of the individual or the public. The abrogation of the contract by the repeal or modification of the ordinance does not deprive the public or any individual of any legal or constitutional right. So the abrogation of the contract by any other municipality to which jurisdiction over the streets and alleys has been transferred does not deprive either the municipality formerly having jurisdiction, or any of its citizens, of any legal or constitutional right.

The village of Oak Park never had any jurisdiction over any of the streets and alleys of the city of Chicago. Any attempt by it to control such streets or alleys or regulate their use would be beyond its power and void. Any contract made by it with reference to the use of such streets or alleys is necessarily subject to the control of the city of Chicago. The power of the city council, under our constitution and laws, is absolute to prescribe the terms upon which street railway companies may lay tracks in the streets and operate them. The council may impose such conditions as in its judgment the public benefit may require, which are not illegal or forbidden by statute. (*West Chicago Street Railroad Co.* v. *City of Chicago,* 178 Ill. 339; *Byrne* v. *Chicago General Railway Co.* 169 id. 75; *Lobdell* v. *City of Chicago,* 227 id. 218.) We held in *Venner* v. *Chicago City Railway Co.* 258 Ill. 523, that the city has the power to do away with the diversity of control and operation of street railways and provide for their single control and operation. This power of the city to require such single control and operation necessarily implies the power of the railway company to agree to such terms. Whatever may be its powers and however broad its field

of operation outside the city it must be limited within the city by the terms imposed by the council, and it has the power to agree to such terms not in violation of law or public policy.

It is argued that the Chicago Railways Company and the County Traction Company are not separate companies, but, in fact, one company. The petition alleged that Andrew Cooke was vice-president of the Harris Trust and Savings Bank, which was to a large extent a fiscal agent of the Chicago Railways Company and all those engaged in financing its necessities, and that in purchasing the Consolidated Traction properties and causing them to be conveyed to the Chicago Railways Company and the County Traction Company he acted at the instance of the Chicago Railways Company and for its benefit; that the County Traction Company was organized with a capital stock of $1000, which capital has been increased to some extent, and was organized at the instance of the Chicago Railways Company and virtually is an agent or subsidiary thereof, and that it is accordingly entirely controlled and dominated by said Chicago Railways Company and has no separate corporate existence or autonomy but is a mere dependency of said Railways Company, organized for the purpose of endeavoring to aid that company in escaping from its legal duties and obligations. As a matter of pleading, these allegations, so far as they may be regarded as material, are merely statements of legal conclusions. Whether Andrew Cooke acted, in purchasing the Consolidated Traction Company properties, at the instance of the Chicago Railways Company and whether the County Traction Company was organized at the instance of the Railways Company is immaterial. It no doubt was thought to be for the interest of the Chicago Railways Company that there should be a purchaser of the lines of street railway outside of the city, and the organization of a corporation for that purpose, even at the instance of the Chicago Railways Company,

was not inconsistent with the separate ownership and control of the company so organized. The allegation that the company so organized was an agent or subsidiary of the Chicago Railways Company, and that it is accordingly entirely controlled and dominated by that company and has no separate corporate existence or autonomy but is merely a dependency of that company, is merely a series of legal conclusions. There are no facts stated from which that conclusion may properly be drawn. The petition alleges the organization of the County Traction Company under the general laws of Illinois, the purpose for which it was organized, and the acts done by it showing its corporate conduct. There is no allegation of any conveyance, agreement, consolidation or merger by which the property of the County Traction Company or its corporate control has been in any way affected. No facts are alleged from which the conclusion follows that the County Traction Company was entirely controlled and dominated by the Chicago Railways Company and had no separate existence or autonomy. Whether such domination and control are supposed to arise from the ownership of a majority of the stock in the County Traction Company or the identity of officers or stockholders of the two companies, or from the existence of some agreement or understanding between the two companies, is not averred. On the other hand, the evidence shows that from the beginning the County Traction Company has been entirely independent in its management and control. There have been no common stockholders or officers. There has been no agreement which has enabled the Railways Company to control in any way the affairs of the County Traction Company. The evidence does not sustain the claim of the appellee that the relation between the two companies was such that they should be regarded, in fact and in law, as one company, but does show they were separate corporations, owned and operated independently.

Since the Chicago Railways Company is prohibited by the ordinance of March 18, 1913, from honoring or issuing transfers the writ of *mandamus* cannot issue against it. The Chicago and West Towns Railway Company has no tracks in the city of Chicago and no right to operate cars therein. It has no arrangement by which it can issue transfers which will be honored, and any such arrangement is impossible. The writ awarded required the Chicago and West Towns Railway Company, within sixty days, to establish a rate of fare of five cents for each passenger for one ride in either direction over the lines mentioned in the ordinance of June 4, 1903, during the entire unexpired term of the rights in the village of Oak Park granted by the ordinance,—that is, until June 4, 1923,—and to provide or cause to be provided free transfers for each passenger, good for carriage upon north and south connecting lines within the limits of said village and the city of Chicago, in the same manner as transfers were given to passengers upon the lines of the Chicago Union Traction Company within the city of Chicago on June 4, 1903. It is apparent that it is not within the power of the appellant to do what this order requires it to do even though it may be subject to the obligation of the Chicago Consolidated Traction Company under the ordinances of the town of Cicero and the village of Oak Park, and though it may, by its failure to comply with such ordinances, be subject to a forfeiture of its rights under them. Though it may be the duty of a defendant to perform an act sought to be enforced, yet if it is not within his power the writ of *mandamus* will, as a general rule, be denied. "The writ should not be granted in any case where it is clear that it would prove unavailing, as where the act sought to be enforced is from its very nature physically impossible or where from extrinsic causes it has become so, or where performance, though not absolutely impossible, is from any cause not within the power

of the defendant." *Ohio and Mississippi Railway Co.* v. *People,* 120 Ill. 200.

The judgment of the superior court is reversed and the cause will be remanded, with directions to dismiss the petition as to the appellant.

*Reversed and remanded, with directions.*