## TODD v. CITIZENS' GAS CO. OF INDIANAPOLIS et al.

### COTTER v. SAME.

#### Nos. 4394, 4401.

Circuit Court of Appeals, Seventh Circuit.
Jan. 16, 1931.

Frederick E. Matson, Earl B. Barnes, and Austin V. Clifford, all of Indianapolis, Ind. (Matson, Ross, McCord & Clifford, and Barnes & Johnson, all of Indianapolis, Ind., of counsel), for appellant Todd.

William B. Cockley and Walter J. Milde, both of Cleveland, Ohio, and Louis B. Ewbank, Samuel Dowden, William L. Taylor, and Jackson Carter, all of Indianapolis, Ind., for appellants Cotter and others.

Fred C. Gause, John W. Holtzman, Edward H. Knight, Henry H. Hornbrook, Paul Y. Davis, Wm. H. Thompson, and Albert L. Rabb, all of Indianapolis, Ind. (Smith, Remster, Hornbrook & Smith, Pickens, Davidson, Gause, Gilliom & Pickens, and Thompson, Rabb & Stevenson, all of Indianapolis, Ind., of counsel), for appellees.

Before ALSCHULER and EVANS, Circuit Judges, and WILKERSON, District Judge.

These appeals are from decrees, dismissing for want of equity bills of appellants, stockholders of appellee gas company, seeking to prevent the transfer by the gas company to the city of Indianapolis of an interest in the property of the gas company, pursuant to the terms of an ordinance passed in 1905, under which the company derived its right to enter upon and use the city streets and to operate its plant. The terms of the ordinance relating to the transfer to the city were embodied in the articles of incorporation of the company.

The first is a derivative action, and jurisdiction is based solely on the alleged unconstitutionality of a validating act passed by the Indiana Legislature in 1929. The second is a representative action, and jurisdiction is asserted on the ground of diversity of citizenship as well as the unconstitutionality of the validating act. The facts are substantially the same in both cases and are not in dispute.

To understand the contentions of the parties, it is necessary to have in mind the powers conferred upon the city by state statutes at the time the ordinance was passed. The city council was given power to license and regulate the supply, distribution, and consumption of artificial and natural gas, to fix by contract or franchise the prices thereof, to regulate the laying of mains and pipes, and to designate the streets and alleys through which the same should be laid and maintained. Acts 1905, p. 252. The state statutes also provided that the board of public works of the city should have power (1) to purchase, construct by contract or otherwise, and operate gas works, provided the power should not be exercised except pursuant to ordinance of the council and after an election held in relation thereto; (2) to contract for the furnishing of gas to the city and its inhabitants, and in the contract to fix terms and conditions and the prices to be charged therefor, provided the contract should be approved by ordinance of the council; (3) to authorize gas companies to use city streets and erect necessary structures therein, to prescribe the terms and conditions of such use, and to fix by contract the prices to be charged to patrons, provided the contract was approved by ordinance of the coun-

cil. Acts 1905, pp. 279, 280. Another section of the act relating to cities provided that a city might determine to erect public utility works (including gas works) or to purchase or lease the same provided the council, before the approval of the contract or resolution therefor, should submit the question to the voters of the city in the manner specified in the act. Acts 1905, p. 392, 393.

The state statute relating to cities also provided that the council should have power to receive gifts, donations, bequests, and public trusts, and to agree to the conditions and terms accompanying the same and bind the corporation to carry them out. Acts 1905, p. 247.

The ordinance of August 25, 1905, approved a contract between the board of public works of Indianapolis and three individuals, who subsequently assigned their interest therein to the appellee gas company. The contract granted permission to enter upon the city streets and to construct, maintain, and operate a system of gas pipes and appurtenances thereto for the distribution and supply of gas to the city and its inhabitants. The grant was subject to the condition that the grantees should organize a corporation under the laws of Indiana to which the franchise and all interests thereunder should be assigned. It was required that the articles of incorporation of that corporation should contain, among other matters, the following provisions:

The capital stock of the corporation shall be not less than $1,000,000, and no increase shall be permitted, unless the new stock shall be sold to the highest bidder at a public auction.

The entire capital stock shall be placed under the control of five trustees, to be named in the articles of incorporation (one of them to be nominated by the Mayor), which board of trustees shall have full, complete, exclusive, and irrevocable power, during the continuance of the corporation, to hold the stock and vote the same as fully and completely as if they were the owners of the stock, to elect directors and fill vacancies in the board of directors. The stock shall be voted as a unit, and, in case of disagreement, the majority shall cast the vote of the board. Vacancies in the board shall be filled in the manner specified in the agreement.

The trustees shall issue to each subscriber to the capital stock, upon payment of the subscription and upon the stock therefor being issued to the trustees, an assignable certificate showing the amount of stock held by the trustees, in trust for the subscriber, and the holder of the certificate shall be entitled to receive all dividends declared on the stock, not exceeding, however, 10 per cent. per annum, so long as the certificates shall remain outstanding and uncanceled.

The earnings of the company shall be used in the following order, to wit: First, to the payment of matured debts and operating expenses; second, to the payment semiannually of said dividends of 10 per centum per annum and any unpaid accrued dividends; third, to such extensions and betterments as may be ordered by the board of public works; and the excess to the payment in whole or partial payments of the amounts subscribed.

When the certificate holders shall have received, by dividends or otherwise, an amount equal to the face of the certificates and interest at the rate of 10 per cent. per annum, the certificates, so issued to the subscribers, shall be deemed fully paid and canceled, and it shall be the duty of the trustees and directors of the company to convey the gas plant and property belonging to the company to the city to be owned and operated or leased by it, and all the right, title, and interest of the company or its certificate holders, stockholders, officers, directors, or trustees shall be deemed to be fully paid and extinguished, and all such certificates, whether of stock or otherwise, shall be surrendered and canceled and the corporation shall be wound up.

The business and prudential concerns of the corporation shall be managed by a board of directors of nine members to be chosen by the board of trustees. If upon the expiration of the term and period of the franchise, the same shall terminate without the payment of the certificates and dividends thereon, as above provided, then, upon notice to such effect, to be given by the board of public works to the board of directors of the corporation at least six months before the expiration of the franchise period, the board of directors shall mortgage the gas plant and property for such sum as will enable the corporation to pay its stock or certificate holders an amount which with what has been paid already will equal the full amount of such subscription, with dividends at the rate of 10 per cent. per annum thereon, and with the proceeds thereof, or, with the mortgage notes so issued in proper amounts, pay off and discharge the amounts due such certificate holders and convey the plant to the city, subject to such obligations and other legal obligations against the company.

The agreement expressly stated that it was understood that all the above stipulations to be provided in the articles of incorporation of the company should bind and be enforceable by the city against the company as conditions of the contract.

The agreement also provided that the grant was made upon the condition that the grantees or their assigns should secure or construct, and put in operation, a fuel gas plant with not less than 100 miles of mains within eighteen months from the date of the sale of the Consumers' Gas Trust Company mains now pending, and, failing therein, should forfeit all rights under the grant.

The agreement also provided that the grant was made on additional conditions. Those conditions provided for a bond for the performance of the contract, protected the city against damage claims, stated requirements as to the laying of pipes and the supervision thereof by the board of public works, specified the quality of gas to be furnished, and limited the price thereof, provided for extensions of service, and for inspections and tests by the board of public works, and contained other regulations to which the utility was to be subject in rendering its service to the public. The agreement provided that it was to be in force for twenty-five years from the date of its ratification by the council, and that thereafter all rights of the company to occupy the city streets should cease.

The agreement also contains the following provisions:

"If the plant and system of mains of said company shall not have become the property of said city by the cancellation of the certificates of subscribers and conveyances of such property to said city by the Board of Directors and Trustees of said company on or before the expiration of the aforesaid period of said franchise, then said city by and through its Board of Public Works upon the expiration of said franchise period, shall have the right to pay any balance remaining due said certificate holders and the plant and property of said company shall be conveyed to said city as above provided to be owned and operated, or owned and leased by it; or, at the option of the City, the Board of Directors of the corporate successor of the second parties shall as heretofore provided upon the conclusion of said franchise period mortgage its plant and with the proceeds thereof, or with the mortgage notes issued in proper amounts, pay off and discharge the amount due certificate holders, and thereup-

on convey said plant to said city subject to such obligations and other legal obligations against said company.

"If at any time the company operating under this franchise should become insolvent and be ordered sold by any proper judicial authority, the city * * * reserves the right to acquire all the property and rights of said company by the payment of the bona fide indebtedness and any balance due the certificate or stockholders of said company, and upon the tender by said city of the amount of such indebtedness and amount due certificate or stockholders the trustees and directors of said company shall upon demand execute proper instruments transferring all of such property and right to the city * * * to be owned and operated or leased by it."

The reference to the Consumers' Gas Trust Company in the ordinance of 1905 requires a statement of the facts as to the organization of that company, the litigation with reference to the rights of its stockholders and the city in its property, and the steps which resulted in the acquisition of its plant by the Citizens' Gas Company. It is in the light of those facts that the franchise ordinance here involved must be read.

The city council in 1887, pursuant to statutory authority, passed a general ordinance authorizing and regulating the use of the public streets for furnishing natural gas. It was provided in the ordinance that the city should have the right on six months' notice to purchase the plant of any corporation accepting its provisions at any time after the expiration of ten years from the date of its passage. The price to be paid was to be determined by appraisal, as provided in the ordinance.

At that time the only gas plant in the city was that of the Indianapolis Gas Company, which supplied artificial gas. Shortly after natural gas was discovered, that company acquired all the lines extending to the producing field. This lead to the organization of the Consumers' Gas Trust Company. Its charter provided for a voting trust of its stock, similar to that in the charter of the Citizens' Company. The charter also provided that, when the certificate holders had received an amount equal to their subscriptions, with 8 per cent. per annum additional, and all indebtedness of the company had been paid, it should be the duty of the company to reduce the price of gas so that it should be supplied at cost.

The Consumers' Company conducted its business until 1904, when the natural gas field failed. It had returned to its certificate holders 95 per cent. of the amount of their subscriptions, in addition to 8 per cent. dividends per annum. It then proposed to pay the remaining 5 per cent. of the subscriptions and thereafter engage in the manufacture and sale of artificial gas at cost. Suit was brought by a stockholder in the United States Circuit Court to enjoin this procedure, and in Consumers' Gas Trust Company v. Quinby, 137 F. 882, it was held by this court that the company was organized for the purpose of furnishing natural gas; that the manufacture and sale of artificial gas was beyond the scope of its charter; that, as the corporation was unable to carry out the purpose for which it was organized, the stockholders were entitled to a distribution of its assets. The city asserted its right, under the ordinance, to purchase the plant. This was challenged by ancillary bill in the stockholder's suit and a decree entered against the city in the Circuit Court. Quinby v. Consumers' Gas Trust Co., 140 F. 362. Upon appeal, that decree was reversed in this court, and the right of the city to purchase was upheld. City of Indianapolis v. Consumers' Gas Trust Co., 144 F. 640.

The decision of this court in the first Quinby Case was rendered on April 11, 1905. The result was that, because of the limited powers of the corporation under its charter, as construed by the court, the certificate holders received, not only the amount of their subscriptions and the stipulated dividends, but also the property of the corporation. The public lost the benefit of the provision for having gas supplied at cost. It is obvious that it was the purpose of all parties to the negotiations leading up to the passage of the ordinance of August 25, 1905, and the organization of the Citizens' Company to avoid the mistakes which had resulted in the decree in the Quinby Case. Two of the grantees in the ordinance were the presidents of the Commercial Club and the Board of Trade, leading civic organizations. The Citizens' Company and its franchise were the product of a movement for the protection of the public against what had happened in the Quinby litigation. It is not necessary to resort to newspaper articles and other extraneous matter to understand the intention of the parties. It clearly appears from the language of the documents when they are read in connection with the record of the Quinby litigation.

The ordinance of August 25, 1905, was passed while the appeal from the decree against the city on its right to purchase the plant of the Consumers' Company was pending, and the portion relating to the sale of the mains of the Consumers' Company refers to the negotiations for the acquisition by the new company of that part of the plant, if the city's right to purchase should be finally sustained.

After the city's right to purchase was sustained, the Citizens' Gas Company was organized, and the grantees of the franchise of August 25, 1905, assigned it to the company. The articles of incorporation contained the provisions required in the ordinance. In the subscriptions to the capital stock of the corporation, the subscribers agreed that the stock should be issued to trustees as provided in the articles of incorporation; and that, when the indebtedness of the company should be fully paid, and the subscribers should have received an amount equal to the amount by them subscribed and paid, with dividends equal to 10 per cent. per annum, then the trustees and directors should execute proper instruments transferring all the property of the company to the city; and that thereupon the interest of the stockholders in the company and all its property should be canceled, released, and extinguished. The company sold and issued to such subscribers $1,000,000 par amount of capital stock. The stock certificates were issued in the names of the subscribers, and recited that they were to be held by the board of trustees in accordance with the articles of incorporation. The stock certificates were then turned over to the trustees, without indorsement, and assignable trustees' certificates issued to the subscribers. Those certificates recited that, with the consent of the stockholders, the stock of the company had been issued to the board of trustees, and that the stock should be and remain under the exclusive and irrevocable control of the board, with full, complete, exclusive, and irrevocable power to hold the stock and vote the same during the continuance of the Citizens' Company as a corporation. The certificates further recited that, "when said certificate holder shall have received by dividends or otherwise, upon said certificate an amount equal to the face value thereof with interest thereon at the rate of ten per cent per annum payable semiannually then this certificate shall be deemed fully paid and cancelled and the interest of said holder in said company and its assets shall thereupon cease and the prop-

erty of said company shall be disposed of as provided in said Articles of Incorporation."

In March, 1911, the Citizens' Company increased its capital stock from $1,000,000 to $2,000,000. The new stock was sold at public auction, as required by the ordinance and articles of incorporation. Written subscriptions were not taken, but in the published notice of the offering, pursuant to which the stock was sold, it was stated that the new stock would be issued in all respects conformably to the terms and conditions of the articles of incorporation. The certificates for the new stock were turned over to the trustees, who issued trust certificates to the purchasers of the new stock, identical in form with those originally issued. In fact, the stock certificates have always been held by the trustees. No stockholder ever held one, or claimed the right to hold any evidence of his rights other than the trustees' certificates or objected to the form of the certificate. All trustees' certificates have been in the same form.

In 1913 Indiana enacted a law (known as the Shively-Spencer Act) creating a Public Service Commission, though which the regulatory power of the state over public utilities was to be exercised. 3 Burns' R. S. 1926, p. 1238.

Section 100 of the act provides:

"Every license, permit or franchise hereafter granted to any public utility shall have the effect of an indeterminate permit, subject to the provisions of this act, and subject to the provision that the license, franchise or permit may be revoked by the commission for cause, or that the municipality * * * may purchase the property of such public utility, * * * paying therefor the then value of such property, as determined by the commission, and according to the terms and conditions fixed by said commission. * * * Any such municipality is authorized to purchase such property and every such public utility is required to sell such property at the value and according to the terms and conditions determined by the commission as herein provided. If this act should be repealed or annulled then all such indeterminate franchises, permits or grants shall cease and become inoperative and, in place thereof, such utility shall be reinstated in the possession and enjoyment of the license, permit or franchise surrendered by such utility at the time of the issue of the indeterminate franchise, permit or grant; but, in no event, shall such reinstated license, permit or franchise be terminated within a less period than five years from the date of the repeal or annulment of this act." 3 Burns' R. S. 1926, § 12773, p. 1262.

In section 1 of the act an indeterminate permit is defined as follows:

"The term 'indeterminate permit,' as used in this act, shall mean and include every grant, directly or indirectly, from the state to any corporation * * * of power, right or privilege to own, operate, manage or control any plant or equipment * * * within this state, for the production, transmission, delivery or furnishing of heat, light, water or power, either directly or indirectly, to or for the public * * * which shall continue in force until such time as the municipality shall exercise its option to purchase, as provided in this act, or until it shall be otherwise terminated according to law." 3 Burns R. S. § 12672, p. 1240.

Section 101 of the act, as amended in 1921, provides:

"Any public utility operating under an existing license, permit or franchise from any county, city or town within the State of Indiana shall, upon filing, at any time prior to July 1, 1923, with the auditor or clerk of any such county, city or town which granted such license, permit or franchise, and with the public service commission of Indiana, a written declaration, legally executed, that it surrender such license, permit or franchise, receive by operation of law, in lieu thereof, an indeterminate permit as provided in the act creating the public service commission of Indiana * * * and such public utility shall hold such permit under all the terms, conditions and limitations of said act as fully and completely as if the same had been done prior to July 1, 1915,"

—that date being the limit of time fixed in the original act within which surrender of existing franchises must be made. 3 Burns R. S. § 12774, p. 1263.

Section 102 of the act provides:

"Any public utility accepting or operating under any indeterminate license, permit or franchise hereafter granted shall, by acceptance of any such indeterminate license, permit or franchise, be deemed to have consented to a future purchase of its property by the municipality * * * at the value and under the terms and conditions determined by the commission, as provided in this act. * * *" 3 Burns' R. S. § 12775, p. 1263.

In 1913, with the approval of the Public Service Commission, the Citizens' Company

acquired by 99-year lease the plant of the Indianapolis Gas Company, its competitor, and became the sole distributor of gas in the city. The company continued its business without taking any steps to surrender its franchise and to obtain an indeterminate permit until 1921. It then encountered financial difficulties arising from the general industrial situation. Its operations were carried on at a loss. It was unable to raise capital for delayed extensions and betterments. It was embarrassed by the provisions of the ordinance fixing maximum rates in applying for increased rates and in appealing to the courts for redress against confiscatory rates.

On August 27, 1921, pursuant to resolutions of the trustees, assuming to act for the stockholders, and of the board of directors, the company executed and filed with the Public Service Commission and the city, as required by law, a declaration of surrender as follows:

"* * * Citizens Gas Company * * * which is the owner and operator of * * * gas plants * * * and is a public utility, declares that it hereby surrenders each and every license, permit and franchise from the City of Indianapolis, Indiana, now owned or held by it, and under and by virtue of which said gas company is operating its gas utility or any part thereof, in said city; and hereby accepts indeterminate permits in lieu of said licenses, permits and franchises * * * as provided in the (public utility) Act * * * of Indiana * * * "

On that same day there was filed in the office of the secretary of state, as required by law, the resolution of the trustees, assuming to act for all the stockholders, creating an issue of $2,000,000 of preferred stock in addition to the outstanding issue of $2,000,000 of common stock. On the same day there was also filed with the secretary of state the certificate of the trustees, assuming to act for all the stockholders, amending the articles of incorporation. Those amendments provided for the issue of the preferred stock without voting power, changed the provisions with reference to the voting trust and trustees' certificates so as to limit them to the common stock, and changed the articles as to application of earnings, so as to put the dividends on the preferred stock ahead of the payments on the common stock.

Amended article X is as follows:

"When all outstanding preferred stock of the company shall have been retired and the holders of the certificates representing the common stock shall have received by dividends, or otherwise, upon said certificates, an amount equal to the face value thereof, together with interest thereon at the rate of ten per cent per annum, payable semi-annually, then said certificates shall be deemed fully paid and cancelled, and it shall be the duty of the trustees and directors of said company to convey said gas plant and property belonging to said company to the City of Indianapolis, subject to all outstanding legal obligations of the company, to be owned and operated or leased by it, and all the rights, title and interest of said company or its certificate holders, stockholders, directors or trustees, shall be deemed to be fully paid and extinguished, and all such certificates, whether of stock or otherwise, shall be surrendered and cancelled and said corporation shall be wound up."

Amended article XII is as follows:

"If, on the 30th day of August, 1930, that being the date of the expiration of the term and period of the franchise granted by the City of Indianapolis * * * which was thereafter assigned to the Citizens Gas Company * * * said certificates representing the common stock of the company together with dividends thereon, at the rate of ten per cent per annum, shall not have been paid, then upon notice of such fact to be given to the directors of said company by the board of public works of said city at least six months before the expiration of such franchise period, the said board of directors shall mortgage its gas plant and property for such sum as to enable it to pay the holders of the certificates representing its common stock, an amount which, with what has already been paid, will equal the full amount of such stock with dividends estimated at the rate of ten per cent per annum, together with the amount necessary to redeem any outstanding preferred stock, and with the proceeds thereof, after redeeming any outstanding preferred stock in accordance with the provision thereof contained in the stock certificates, or with the mortgage notes so issued in proper amounts, pay off and discharge the amounts due such holders of the certificates representing its common stock and convey said plant and property to said city, subject to such mortgage and other legal obligations against the company. * * * "

$1,000,000 of the preferred stock authorized by the resolution was issued and is still outstanding. No action was taken by any stockholder to attack the validity of the

amendments of August 27, 1921, or the issue of preferred stock thereunder.

On March 11, 1929, the General Assembly of Indiana passed an act "relating to corporations organized before May 1, 1913, for the purpose of furnishing gas, * * * electric lights or water, or light, heat and power to any town or city * * * or inhabitants thereof, and the articles of incorporation of which provide for the transfer of the property of such corporation to such town or city, legalizing certain provisions in the articles of incorporation thereof and authorizing the conveyance of the property of such corporations to such towns or cities and authorizing such towns or cities to accept such conveyance. * * * "

The act contains a description of provisions in original and amended articles of incorporation which is substantially the same as the articles of the Citizens' Company relating to the payment of the stockholders and the transfer of property to the city, legalizes such provision, and authorizes the town or city to accept the transfer of the property without submitting the question to its voters at an election and without the consent of the Public Service Commission. Acts 1929, c. 78, p. 268.

On March 20, 1929, the board of public works of the city adopted a resolution in which, after reciting the terms of the ordinance, the articles of incorporation of the company, and the provisions of the certificate, demand was made on the company to mortgage its property, pay off the certificate holders, and then convey the property to the city, reserving to the city the right to furnish funds for such purpose. Copies of the resolution were served on the directors and trustees of the company, who assert in their answers herein that they will comply with the demand of the board, unless enjoined from so doing.

Plaintiffs (appellants here) asserted their right to relief because (1) the surrender of the franchise in 1921 ended all rights and obligations thereunder, and created a new contract between the state and the Citizens' Company and its stockholders, of the benefits of which they cannot constitutionally be deprived without their consent; (2) nothing remotely resembling a public charitable trust was ever created; (3) the city could not validly acquire an option to purchase a public utility without a vote of its people and the consent of the Public Service Commission; (4) the city's option violated the rule against perpetuities; (5) the legalizing act of 1929 is invalid for constitutional reasons; (6) the stockholders are not estopped.

Defendants (appellees here) claimed (1) that the interests of the citizens and gas consumers of the city were not affected by the surrender; (2) that a public charitable trust was created in favor of the citizens and gas consumers of Indianapolis; (3) that the city had power in 1905, and now has power, to acquire the property of the gas company, in the manner proposed; (4) that the rule against perpetuities is inapplicable; (5) the legalizing act is valid and violates no rights of the company or its stockholders; (6) the company and its stockholders are barred by estoppel from asserting the invalidity of the provisions in the ordinance and the charter of the company. The District Court sustained the position of the defendants, and dismissed the bills. The plaintiffs have appealed from the decrees of dismissal.

WILKERSON, District Judge (after stating the facts).

To decide the questions presented it is necessary, first, to examine the ordinance, the articles of incorporation of the company and related documents, and to determine the nature of the relationship which the parties intended to create between the company and its stockholders on the one hand and the city and its inhabitants on the other. We may then consider the legal objections to the plan which was adopted and the effect of the surrender under the indeterminate franchise provision of the public utility law.

The first step in the plan was the contract, approved by the council, between the board of public works and the individuals. Those individuals were not authorized to exercise any rights in the city streets. There was no franchise, license, or permit to them. There was to be no grant, until the corporation, to be organized by them, by declaration in its charter, should fix the rights of its stockholders and of the city in the property to be acquired to carry out the purpose of the grant. Thus the existence of the grant was removed from the field of mere contract relations between grantor and grantee, and made dependent upon the creation of a corporation in whose organic law the rights of the city were embedded. It is as clear as it is possible for words to make it that there should be no grant of rights in the streets except to a corporation which, by the voluntary act of all its stockholders, should declare, in advance, that the property acquired with the money contributed by them should

be held under the obligation of the corporation to convey it to the city when the contributions with interest had been returned, and that, upon the return of the contributions, as provided, the rights of the stockholders should be extinguished. It was plainly the intention of the parties that, in order to make the proposed grant effective, the fiduciary capacity in which the property used in the public service was to be held by the grantee was to be evidenced by the articles of incorporation of the company which was to exercise the rights under the grant.

The provisions thus required to be embodied in the articles of incorporation were those relating to the manner in which increases of capital stock should be made, the publication of reports, the right of the city to examine books and plant, the creation of the voting trust, the application of earnings, the duty of the trustees and directors to convey the plant and property of the company to the city when the certificate holders had received the face value thereof and 10 per cent. interest, the cancellation of stock and trustees' certificates when the same were paid as provided, and the duty of the directors, at the expiration of the twenty-five year period of the franchise, upon six months' notice by the city, to mortgage the plant and property and to pay off the certificate holders and to convey the plant to the city subject to such mortgage and other legal obligations.

The contract approved by the ordinance contained other conditions relating to the time for the construction and putting into operation of the plant, the giving of bonds, the indemnification of the city against damages resulting from acts or omissions of the company, the furnishing of plans, the supervision by the board of public works of the construction work, the placing of service pipes, the laying of mains, the kind of materials to be used, the quality of gas to be furnished, the price to be charged therefor, the extensions of service and kindred regulations of the exercise of the permit to use the streets.

The intention that the rights granted to the company should be exercised in a fiduciary capacity is thus shown by the two kinds of conditions specified in the contract approved by the ordinance. The first embraced those conditions which were definitive of the kind of a corporation to which alone the grant could run. The second embraced those conditions relating to the exercise of the grant and which were not intended to be operative until the corporation had been created, as required, and had entered upon the exercise of

its charter powers. The conditions of the first class were not parts of the grant of permission to use the streets. They were the requirement to be complied with before the rights under the grant commenced. They related to the organization and charter powers and limitations of the corporation to which "this franchise and all interests thereunder shall be assigned."

The next step in the plan was the incorporation of the Citizens' Company, whose object, as stated in the articles of incorporation, was to supply the citizens of Indianapolis with light, heat, and power. The articles included the requirements of the ordinance precisely as framed. The subscriptions to the stock recited that the company was formed on the plans set out in the franchise for the protection of the public interest, and the subscribers agreed to the creation of the voting trust and to the transfer of the property of the company to the city and the cancellation of their interest therein when they were paid off as provided. The stock was issued, turned over to the trustees, and trustees' certificates representing the interest of the subscribers were issued. Those certificates reiterated the provisions of the articles of incorporation as to the voting trust, the cancellation of the interest of the holders when the face of the certificates with interest was paid, and the disposition of the property as provided in the articles. The company thereupon executed the bonds required by the ordinance and entered upon the city streets and other public property.

The subscribers to the stock intended, in our opinion, that the property acquired by the money paid in by them, should be held by the company, as a trustee, for the benefit of the inhabitants of Indianapolis, subject to a charge in favor of the certificate holders to the extent of their investment, to be conveyed to the city as successor upon the extinguishment of the charge.

Appellants urge that the elements of such a trust cannot be found in the facts presented in this case. No formality of language, however, is required. The court looks through form to substance. The omission of the words "in trust" is not material. That there is a precedent charge in favor of private individuals does not affect the character or existence of the trust. It is not essential that the purpose should be described in legal phraseology. Any agreement or contract in writing made by the person having the power of disposal over property, whereby such person agrees or directs that a certain fund or

particular parcel of property shall be held or dealt with for the benefit of others, in a court of equity raises a trust in favor of such other against the person making such agreement. Richards v. Wilson, 185 Ind. 335, 368, 112 N. E. 780; Long v. Union Trust Company (C. C. A.) 280 F. 686; Hoeffer v. Clogan et al., 171 Ill. 462, 49 N. E. 527, 40 L. R. A. 730, 63 Am. St. Rep. 241; Russell v. Allen, 107 U. S. 163, 2 S. Ct. 327, 27 L. Ed. 397; 5 R. C. L. 296, 297. The doctrine of charitable uses is a part of the law of Indiana, and that law is controlling here on that point. Jones v. Habersham, 107 U. S. 174, 179, 2 S. Ct. 336, 27 L. Ed. 401.

It is also the claim of appellants that the establishment of a gas plant for the purpose of supplying light, heat, and power to the city and its inhabitants is not for a use recognized in law as proper for a public charitable trust. The definition given by Mr. Justice Gray in Jackson v. Phillips, 14 Allen (Mass.) 539, 556, has been repeatedly quoted and applied:

"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature."

It is easily seen that it is impossible to specify the innumerable objects or purposes for which a charitable trust may be created. The enforcement of charitable uses cannot be limited to any narrow and stated formula. It must expand with the advancement of civilization and the daily increasing needs of man. New discoveries in science, new fields and opportunities for human action, the differing condition, character, and wants of communities change and enlarge the scope of charity. Indeed, it has been stated generally that "a charitable use, where neither law nor public policy forbids, may be applied to almost any thing that tends to promote the well-doing and well-being of social man." Ould v. Washington Hospital, 95 U. S. 303, 311, 24 L. Ed. 450.

Municipal corporations at the time of these transactions were authorized by the law of Indiana to purchase, construct, and operate gas plants, and the property so acquired was held as the property of the municipal corporation for public use, and charged with a public trust, of which the inhabitants of the city were the beneficiaries. Lake County Water & Light Co. et al. v. Walsh, 160 Ind. 32, 65 N. E. 530, 98 Am. St. Rep. 264. We think, therefore, that under Indiana law the establishment and operation of a gas plant was a proper object of a public charitable trust. In our opinion, nothing was decided in Consumers' Gas Trust Co. v. Quinby (C. C. A. 7) 137 F. 882, which is inconsistent with this view.

The Citizens' Gas Company was organized under the statutes of Indiana providing for the incorporation of manufacturing and mining companies. Its object was stated to be to supply the city of Indianapolis with light, heat, and power. In the attainment of that object it was essential that a grant of right to use the streets and other city property be obtained. It was therefore appropriate to include in its articles provisions as to the method by which its object was to be attained, to limit the interest of its stockholders in its property, and to impose upon its directors the obligation to convey to the city when the burden in favor of the stockholders had been discharged. The corporation, while technically private, had in view a public enterprise, in which the public interests were directly involved. It was a quasi public corporation. Consumers' Gas Trust Co. v. Quinby, supra; People v. Suburban R. Co., 178 Ill. 594, 53 N. E. 349, 49 L. R. A. 650. Provisions for the protection of the public interests were properly included in its charter, and are binding upon its stockholders and directors, who must act in accordance therewith until they are legally abrogated or altered.

Appellants next urge that the city was in 1905, and now is, without power to acquire the gas property in the manner proposed. The city had express authority to purchase, construct, and operate gas works, but the power could not be exercised except after approval by popular vote at an election had for that purpose. The city also had express power to authorize gas companies to use the city streets and to prescribe the terms and conditions of such use. The city also had express power to receive gifts, donations, bequests, and public trusts, and to agree to the conditions and terms accompanying the same and bind the corporation to carry them out.

866

■■■■ While the powers of a corporation are not to be enlarged by construction, they must be construed with reference to the object of their creation and so as to carry into effect every power clearly intended to be conferred. When a municipal corporation has the power to grant or refuse in its discretion permission to a public service company to occupy the streets with its structures, it may grant such permission subject to such conditions as it may see fit to impose, provided they are not against public policy or in derogation of any right which the company may have under its franchise from the state. The municipality, by means of such conditions, may impose obligations upon the company which it would have no power or authority to impose under its general charter powers, and, if the company accepts the grant, it is bound by the conditions, and is estopped to question their validity. Southern Pacific Co. v. Portland, 227 U. S. 559, 572, 33 S. Ct. 308, 57 L. Ed. 642; Chicago General Ry. Co. v. City of Chicago, 176 Ill. 253, 52 N. E. 880, 66 L. R. A. 959, 68 Am. St. Rep. 188; People ex rel. Jackson v. Suburban R. Co., 178 Ill. 594, 53 N. E. 349, 49 L. R. A. 650; People ex rel. Dwight v. Chicago Rys. Co. et al., 270 Ill. 278, 110 N. E. 394; Town of Newbern v. Barnesville National Bank (C. C. A.) 234 F. 209, L. R. A. 1917B, 1019.

■■■■ Appellants assert that the franchise contract included an agreement for the acquisition of the gas plant by the city in its proprietary capacity. But, in that view, we think the agreement could not be regarded as a purchase in 1905 or a contract for a purchase. It was an agreement by which the city obtained an interest in the plant subject to the charge in favor of the certificate holders. No funds of the city were paid, or contracted to be paid, for the plant. We think that approval at an election was not essential to the validity of the contract. And certainly this is true if a trust was created, as above pointed out, for the city in express terms is given power to receive public trusts.

■■■■ Appellants claim that the city is now without power to acquire the gas plant because such acquisition has not been approved at an election and authorized by the Public Service Commission. The Indiana statutes, in our opinion, do not require such an authorization of the conveyance which the directors of the company are commanded by the articles of incorporation to make. It is not a purchase by the city. The acts of the

city in connection with the operation of the plant, after the directors have performed their charter duties, are matters with which the certificate holders are not concerned. When they are paid off, as provided, their interest is at an end. Ultra vires acts in operating or disposing of the plant after the conveyance must be questioned by the state in an appropriate proceeding.

■■■■ The rights asserted by the city are attacked as void under the rule against perpetuities. An attempt is made, it is charged, to incumber the property of the Citizens' Company for twenty-five years with unvested contingent interests.

The legal title to the property which was acquired with the money contributed by the certificate holders was in the Citizens' Company, subject to the trust in favor of the inhabitants of the city. This, we think, plainly appears from the charter of the company. The conveyance to the city to be made when the charge in favor of certificate holders released was a continuance of the trust; the city being the successor in the fiduciary relationship. This public charitable trust is not within the rule against perpetuities. The rights arising from the provisions of the company's charter vested in interest upon the organization of the company, and were postponed merely in enjoyment by the charge on the property in favor of the certificate holders.

■■■■ But the rule may not be invoked even on appellants' theory that the rights of the city amounted to nothing more than an option to be exercised at any time within twenty-five years. The rule against perpetuities concerns rights of property only, and does not affect the making of contracts which do not create the rights of property. By the great weight of authority, a mere option to purchase land does not vest the holder of an option with any interest, legal or equitable, in the land. Richardson v. Hardwick, 106 U. S. 252, 255, 1 S. Ct. 213, 27 L. Ed. 145; Thacher v. Weston, 197 Mass. 143, 147, 83 N. E. 360; Keogh v. Peck, 316 Ill. 318, 147 N. E. 266, 38 A. L. R. 1151, and cases cited in 39 Cyc. 1238; note 19. The rule to be applied to what appellants claim is an option in a franchise contract would be the same as is applied in the case of an option to purchase contained in a lease, and such options are not within the rule against perpetuities. Keogh v. Peck, supra, and cases cited; Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 128 N. E. 177.

Appellants invoke the Indiana Public Utility Act of 1913, and assert that the surrender in 1921 under section 101 of the act operated to end all rights and obligations under the franchise, and therefore to relieve the directors from compliance with the provisions of the company's charter requiring the conveyance to the city. The provision of the Indiana law was taken from the Wisconsin statutes, and the Supreme Court of Indiana has recognized the decisions of the Wisconsin Supreme Court as persuasive in its construction. Greensburg Water Co. v. Lewis, 189 Ind. 439, 128 N. E. 103, 107.

In Calumet Service Co. v. Chilton, 148 Wis. 334, 355, 135 N. W. 131, 139, the court, referring to the language, "shall * * * receive by operation of law in lieu thereof, an indeterminate permit * * * and such public utility shall hold such permit under all the terms, conditions and limitations of this Act," and repeating substantially the language of La Crosse v. La Crosse G. & E. Co., 145 Wis. 408, 130 N. W. 530, 535, said:

"That negatives, as was said, 'any idea that the Legislature contemplated the so-called indeterminate permit would be subject to any conditions or limitations of the surrendered grant; that any limitation or condition was in legislative contemplation, except those "of this act" independently of the scope of the mere privilege feature and appropriate police regulations. The idea was the exchange of a privilege held upon specified conditions and limitations mentioned therein or attached thereto for a new one of equal dignity' as to the privilege feature, 'subject only to the conditions and limitations of this act.' * * *

"There is no suggestion in the statutes of coercion, no hint of a purpose to take away from franchise owners anything other than by their consent; exchanging in each case a privilege with new incidents for an old one with its incidents; a complete change from an existing to a new condition. * * * 'Such statute [the public utility act] was made unmistakably exclusive as to everything affecting the service, its character, and charges therefor to consumers, whether public or private. The extinguishment of the obligatory features of the old franchise as to one side by necessary inference operated to extinguish such features as to the other. Such must have been the legislative purpose. * * * The thing existing after consummation of an exchange * * * was the new privilege, emanating directly from the state, denominated an "indeterminate permit"; a permit to do the things theretofore licensed by the state through the municipality as a state agency, but now unconditionally, except as specified in the public utility law.' "

In Greensburg Water Co. v. Lewis, 189 Ind. 439, 453, 128 N. E. 103, 107, the court said:

"By this acceptance the minds of the parties met and agreed on the terms of the proposal embodied in the act, and a contract was thereby concluded between the state and appellant whereby all the terms, conditions, and provisions of the existing franchise-agreement were abrogated and rescinded. The state was a party to the franchise agreement which the city of Greensburg made with appellant, acting for the state under delegated authority. Later the state, acting directly through its Legislature in making the proposal and through its Public Service Commission, on which it had conferred express authority in the premises, entered into a contract with appellant by the terms of which such franchise agreement was abrogated and rescinded in toto as to both parties. * * * Calumet Service Co. v. Chilton, 148 Wis. 334, 356, 135 N. W. 131, 140."

In Chicago, L. S. & S. B. Railway Co. v. Guilfoyle, 198 Ind. 9, 16, 152 N. E. 167, 170, 46 A. L. R. 1465, the court said:

"Those terms, conditions, and limitations included a complete abrogation of all the contract rights of the public utility under its franchise, submission to the orders of the Public Service Commission in the matter of fixing rates, keeping accounts, making reports to which the public shall have access, controlling the conduct of the company's business and determining what service shall be rendered, issuing stocks, bonds, and notes, and leasing or conveying property, as well as holding all property devoted to the service of the public at all times subject to be purchased by the municipality at a price fixed by said commission, or fixed by a court to which the matter may be appealed. * * * Being terminated so far as it gave the public utility any rights and privileges as against the city and state, the franchise contract was no longer binding in favor of either city or state. * * *."

In Valparaiso Lighting Co. v. Public Service Commission, 190 Ind. 253, 263, 129 N. E. 13, 16, the court, referring to a contract made by the lighting company with another utility, said:

"In its order the commission recognized this contract as conferring valuable proper-

ty rights upon the appellant. These property rights were obtained before the enactment of the Public Service Law, and prior to the time that the ▪ * * Company surrendered its franchises, but in fixing a valuation * * * this contract of appellant's was not considered. * * * In surrendering its franchise appellant did not part with any of its property except the franchise. * * * "

▪▪▪ We find nothing in the language of the statute or in the decisions of Wisconsin prior to its enactment which would indicate an intention on the part of the Legislature that a public utility, by surrendering its franchise, might thereby destroy vested property rights which it had voluntarily created, and release itself from obligations respecting those rights which it had voluntarily undertaken before the existence of the franchise and as an inducement to the municipality to make the grant of the privilege.

We are not dealing with the question of the power which the state might have exercised with respect to vested property rights created in the public interest as an inducement to the grant, if it had seen fit to do so. The supreme authority of the state over both proprietary and governmental functions of its agency, the municipality, is not to be gainsaid. The question here is, What has the Legislature done? It has authorized the giving up of one privilege from the state and the acceptance of another in lieu thereof. It has not required the utility, as a condition of the exchange, to give up any of its property rights; and it is equally clear that it has not authorized the utility, by the surrender, to expand its property rights, at the expense of the public. The obligations from which the utility frees itself upon the assumption of the new obligations are those "relating to the privilege feature."

▪▪▪ The ordinance of 1905 is called a "franchise ordinance." There was much more in it, however, than the license, permit, and franchise to use the city streets and other public property and the conditions regulating the exercise thereof. It embraced the specifications defining the kind of a corporation to which alone the grant might run. There could be no effective grant until after the corporation had been organized, as required. The limitations on the rights of stockholders and the duty of the directors to convey to the city were embodied in the charter of the corporation. Those provisions of the company's charter were not a part of the company's license, permit, or franchise or an incident thereof, within the meaning of those words as used in the Public Utility Act, and were not affected by the surrender. A public utility may be operated by a trustee. It may not convert its title as trustee into one of absolute ownership by surrendering its franchise. It may have paid money or given vested property rights to the state or its agency in order to obtain the franchise. It may not by the surrender require the return of the money or regain the property rights with which it has parted. This case, in our opinion, is to be distinguished from Terre Haute & Indianapolis R. Co. v. Indiana, 194 U. S. 579, 24 S. Ct. 767, 48 L. Ed. 1124, and similar cases relied upon by appellants.

In view of our ruling as to the effect of the surrender, it is not necessary to consider the questions relating to the amendment of the company's charter, reiterating the provisions of the original charter as to the rights of stockholders and the city, made contemporaneously with the surrender.

It is also unnecessary to consider the questions relating to the validity of the legalizing act of 1929. Obviously, if the surrender of the franchise did not extinguish the provisions of the company's charter as to stockholders' rights and the conveyance to the city, the legalizing act did not deprive the appellants of any rights protected by either federal or state Constitution.

The District Court rightly dismissed the bills for want of equity and its decrees should be, and are, affirmed.