CHASE NAT. BANK OF CITY OF NEW YORK v. CITIZENS GAS CO. OF INDIANAPOLIS et al.

SAME v. INDIANAPOLIS GAS CO.

Nos. 7143, 7144.

Circuit Court of Appeals, Seventh Circuit.

June 6, 1940.

Rehearing Denied July 19, 1940.

William L. Taylor and Harvey J. Elam, both of Indianapolis, Ind., and Howard F. Burns and John Adams, both of Cleveland, Ohio (Baker, Hostetler & Patterson, of Cleveland, Ohio, of counsel), for Chase Nat. Bank.

Louis B. Ewbank and William R. Higgins, both of Indianapolis, Ind., for Indianapolis Gas Co.

Paul Y. Davis and William G. Sparks, both of Indianapolis, Ind. (Davis, Pantzer, Baltzell & Sparks, of Indianapolis, Ind., of counsel), for Citizens Gas Co. of Indianapolis.

Edward H. Knight, Michael B. Reddington, William H. Thompson, and Patrick J. Smith, all of Indianapolis, Ind., for City of Indianapolis and others.

Before MAJOR and KERNER, Circuit Judges and IGOE, District Judge.

KERNER, Circuit Judge.

This action was brought by Chase National Bank (as trustee under a deed of trust) against (1) the city of Indianapolis and the individual members of its board of trustees and its board of directors for Utilities, (2) the Citizens Gas Company and (3) the Indianapolis Gas Company. Hereafter Chase National Bank will be referred to as "Chase"; defendant (1) as the "City"; defendant (2) as the "Citizens Gas"; and defendant (3) as the "Indianapolis Gas."

Chase sued as trustee under a mortgage deed of trust securing the payment of principal and interest of the mortgage bonds of Indianapolis Gas. Among other things Chase sought to recover judgment for the overdue interest on the bonds against all of the defendants and also against the property formerly owned by Citizens Gas and now owned and operated by the City. Chase also sought a declaratory judgment holding that a certain lease hereafter described is binding on all the defendants and the property just referred to.

The cause was tried by the District Court who made special findings of fact and pronounced its conclusions of law thereon. In substance the court concluded that the lease in question was invalid, and that Chase recover the sum of $1,032,-150 from Indianapolis Gas (this being the amount of overdue and unpaid coupons on the Indianapolis Gas bonds at the time of the court's decree). Chase and Indianapolis each prosecuted separate appeals from the court's decree. These appeals have been consolidated and are now before this court.

Both Chase and Indianapolis Gas contend that the District Court erred in holding the lease invalid and not binding on Citizens Gas and the City. Moreover, Chase contends that the District Court erred in failing to render judgment for unpaid coupons against all the defendants and the property referred to above. These contentions and others as well shall be considered in the course of the opinion. Now we shall relate the pertinent facts which on the whole are not in dispute.

Natural gas was discoverd in Indiana in 1886 several miles from Indianapolis. At that time the only gas plant in the City was that of Indianapolis Gas, which supplied artificial gas. Shortly after natural gas was discovered, Indianapolis Gas acquired all the natural gas lines extending from the city to the producing field. The

people feared a possible monopoly by Indianapolis Gas. This led to the birth of the Consumers' Gas Trust Company, organized in 1887 for the purpose of furnishing natural gas. For more factual detail, see Consumers' Gas Trust Company v. Quinby, 7 Cir., 137 F. 882; Todd v. Citizens' Gas Co. (Cotter v. Citizens' Gas Co.), 7 Cir., 46 F.2d 855, 859, 860.

In 1902 Indianapolis Gas executed a mortgage to secure the payment of bonds issued and to be issued in the future. The mortgage contained an after-acquired property clause, and Chase is now the sole trustee under the mortgage deed of trust. Originally, $4,000,000 bonds were issued. Later more bonds were issued, and now there are bonds outstanding in the amount of $6,881,000. For more factual detail, see Chase Nat. Bank v. Citizens Gas Co., 7 Cir., 96 F.2d 363, 364.

The Consumers' Gas Trust Company conducted its gas business until 1904, when the natural gas field failed. This marked the corporate death of this company, for the manufacture and sale of artificial gas was beyond the scope of its charter. Quinby case, 7 Cir., 137 F. 882. At this time the City's right to purchase this plant arose, and the doubt was resolved in the City's favor. City of Indianapolis v. Consumers' Gas Trust Co., 7 Cir., 144 F. 640. See, also, Act of 1905, Ind., c. 129, pp. 247, 252, 279, 280, 396, c. 139, p. 434; Todd case, supra, 7 Cir., 46 F.2d at pages 857, 858. The City did not purchase the plant, however, but the circumstances at this time gave birth to Citizens Gas (as shall be described below).

On August 25, 1905 the City passed its "franchise ordinance," by virtue of which it entered into a franchise contract granting the right to carry on the business of manufacturing and distributing artificial gas to the City and its inhabitants for 25 years. This franchise was granted on the express condition that the grantees would organize a corporation to which the franchise would be assigned and whose charter would include certain specified provisions. In 1906 Citizens Gas was organized and to it was assigned the franchise just mentioned. The provisions required to be embodied in the charter, described below, in the main related to the capital stock, the creation of the voting trust and the duty of the trustees to convey the plant to the city upon certain conditions.

Citizens Gas was organized for a corporate term of 50 years for the purpose of supplying the city of Indianapolis with light, heat and power. The capital stock was issued immediately and then turned over to the trustees, and certificates of equitable ownership were delivered to the owners of the stock. The trustees and directors elected by them were to operate the gas plant until the time came for them to convey the property to the City. The duty to convey was dependent upon the receipt by the certificate holders of an amount equal to their investment plus a return of 10% per year thereon. Upon the satisfaction of the claims of the certificate holders, the plant and property of Citizens Gas was to be conveyed to the City subject to all outstanding legal obligations of the company.[1]

Once organized Citizens Gas purchased the gas plant property of Consumers Gas Trust Company and soon this public utility was actively engaged in the business of

---

[1] The basic provisions of the franchise contract and the articles of incorporation in this regard are the following:

Franchise Contract, Sec. 1(g). If the certificate holders receive x amount (i. e., their investment plus a 10% return thereon) prior to the expiration of the franchise period, the plant property shall be conveyed to the City and the "corporation shall be wound up."

Franchise Contract, Sec. 1(i). If x amount not paid up and upon 6 months' notice by the City prior to the expiration of the franchise period, the plant shall be mortgaged in the sum of x amount, x amount paid up and the property transferred to the City "subject to such obligations and other legal obligations against said company."

Franchise Contract, Sec. 22. If x amount not paid up and the period expires, then the plant shall be conveyed upon the City paying up the balance of x amount, or, at the option of the City the plant shall be mortgaged in the sum of x amount, the certificate holders paid up and the plant property then conveyed to the City "subject to such obligations and other legal obligations against said company."

Articles of Incorporation. Sections 10 and 12 are substantially similar to Secs. 1(g) and 1(i) of the Franchise Contract. Sections 10 and 12, as amended, are also substantially similar to Secs. 1(g) and 1 (i) of the Franchise Contract, except that Section 12 (as amended) provides for conveyance "subject to such mortgage and other legal obligations against said company."

manufacturing and distributing gas. As such, Citizens Gas became "amenable to the law [of Indiana] to the same extent as any other public utility." Williams v. Citizens' Gas Co., 206 Ind. 448, 457, 188 N.E. 212, 215. Also "the Citizens' Gas Company, as a public utility, had the privilege of surrendering its franchise and the right to receive an indeterminate permit," Williams case, 206 Ind. at page 458, 188 N.E. at page 215, supra, and this it did in 1921, although receiving this benefit under the law carried with it utility consent to a future purchase of its property by the municipality which it served. 10 Burns' Indiana Stat.Ann.1933, Secs. 54-605 and 54-606.

These then were the circumstances which gave birth to Citizens Gas, and to the courts these circumstances spelled out a public charitable trust. As this court expressed it, Citizens Gas "was a quasi public corporation"; the "legal title to the property which was acquired with the money contributed by the certificate holders was in the Citizens' Company, subject to the trust in favor of the inhabitants of the city. * * * The conveyance to the city to be made when the charge in favor of certificate holders was released was a continuance of the trust; the city being the successor in the fiduciary relationship." Todd v. Citizens' Gas Co., 7 Cir., 46 F.2d 855, 865, 866. Yet, even granting the "existence of a trust relationship between the Citizens' Gas Company and a class of persons [inhabitants of the City] * * *, that relationship cannot qualify the power of control of the state over the Citizens' Gas Company as a public utility." Williams v. Citizens' Gas Co., 206 Ind. 448, 457, 188 N.E. 212, 215.

And thus it came to pass that Citizens Gas and Indianapolis Gas became and were competing utilities in the city of Indianapolis. This competitive condition existed until 1913 when negotiations between the two rivals were begun which culminated in the execution of the 99 years lease in question. It is to be noted that in 1913 Indianapolis Gas had 375 miles of mains and was completing a modern coke oven and plant, and Citizens Gas had 184 miles of mains. The capital stock of the former was $2,000,000 and bonds in the amount of $4,835,000 were outstanding, while that of the latter was $1,250.000 and $1,247,000 respectively. In addition reports issued by Citizens Gas to its stockholders during this period indicated that it considered the existing competition between the two rivals dangerous to the company and to the community and that a merger would make possible certain important economies.

At any rate in March of 1913 the Indiana legislature passed the Shively–Spencer Act which created the Public Service Commission and conferred upon it certain broad powers of control and regulation over public utilities. 3 Burns' R.S.1926, p. 1238, § 12672 et seq. Among other things the act provided that when two public utilities are engaged in the same business in the same locality, one may lease or sell its property to the other if the transaction meets with approval by the Commission. Shortly thereafter the two utilities in question jointly petitioned the Public Service Commission for permission to execute the 99-year lease here involved.

The power to execute this 99 years lease was authorized by the Commission in October of 1913. According to the lease as finally approved and executed, Indianapolis Gas leased its gas plant property to Citizens Gas for a term of 99 years. In return the lessee agreed to pay a 6% return on the capital stock of Indianapolis Gas (par value $2,000,000), interest on the mortgage bonds of Indianapolis Gas ($6,881,000 now outstanding), and taxes on the leased property plus certain additional miscellaneous expenditures. During the administrative proceedings one Frank S. Fishback intervened and objected to the execution of the lease. The City was represented by counsel but it did not object to the execution of the lease or to the order of the Commission. The objections were overruled, an order approving the lease entered, and Fishback's petition for rehearing denied.

Fishback intervened as an inhabitant of the city of Indianapolis and as certificate holder of Citizens Gas, and objected in essence that the lease was invalid. Among other things he stated the following: Citizens Gas had no power to execute the lease because (a) the duration of the lease exceeded the corporate life of the lessee and (b) the city of Indianapolis was the real owner of the lessee's property. In his petition for rehearing he stated the following: (1) Compliance with the terms of the lease would make it impossible for Citizens Gas to perform its contract with the City relating to the taking over of the property of Citizens Gas and (2) the City had not

given its consent to the lease. The Commission overruled these grounds of objection and approved the lease.

Then Fishback instituted suit in the state court to set aside the order of the Commission, and joined as parties defendant the Commission, Citizens Gas, Indianapolis Gas, and the City. In the main the complaint alleged the grounds urged at the administrative proceedings. The City's answer denied these alleged grounds, and the other defendants demurred thereto. On the day of judgment and prior to entry thereof Fishback dismissed as to the City. A judgment was rendered sustaining the demurrers and an appeal was taken therefrom. Later the appeal was dismissed for failure to perfect it in time. Fishback v. Public Service Commission et al., 193 Ind. 282, 138 N.E. 346, 139 N.E. 449.

Thus it happened that in 1913 the competition between Indianapolis Gas and Citizens Gas came to an end. Citizens Gas acquired the plant property of the other and from 1913 to September 9, 1935, operated the leased property with its own as part of a consolidated system. During this period Citizens Gas controlled the entire gas business of the city of Indianapolis and after 1921 it operated the two properties in question under an indeterminate permit of the Public Service Commission. In all Citizens Gas made payments under the lease that amounted to $11,668,984.77. It also expended around $2,000,000 for capital improvements on the leased property,

but for this it was reimbursed by the issuance of Indianapolis Gas bonds which Citizens Gas then sold to the public through a firm of investment bankers.[2]

On March 11, 1929, the Indiana legislature passed legislation which authorized cities to "take over, adopt and assume the performance of the provisions of any lease under which any utility property may be held at the time of the acquisition of any utility by any such city." Chapter 77, Laws of 1929, Ind., pp. 252, 257, 259, 260. This legislation also provided that the transferee city "shall be authorized to accept, hold and own all the property of such corporation so transferred to it * * * and any right, title or interest such transferring corporation [the utility] may have in any lease upon other property." Chapter 78, Laws of 1929, Ind., pp. 268-271. This legislation becomes pertinent in view of certain pleadings in a federal case filed April 30, 1929. Todd v. Citizens' Gas Co. et al., 7 Cir., 46 F.2d 855. Therein the city of Indianapolis admitted in its answer to the complaint that the legislation above was introduced and passed at the request of the City and that the particular legislation was prepared by special counsel of the City "employed for the purpose of bringing about a transfer of the plant and property" of Citizens Gas to the City.[3]

Nine days later on March 20, 1929 the City gave Citizens Gas notice that it was exercising its right to take over the trust

---

[2] In marketing the Indianapolis Gas bonds the firm of investment bankers used circulars representing that Citizens Gas had a 99-year lease on the property of Indianapolis Gas and that Citizens Gas had guaranteed the payment of the interest on these bonds.

The record shows that copies of these circulars were first sent to the Secretary and General Manager of Citizens Gas for approval and correction. The record also shows that the firm knew the factual history leading up to the organization of Citizens Gas and knew also of Section 32 of the 99-year lease which provided that "In event it should be determined by a court * * * that the contract is ultra vires or void 'because of the length of term created * * * then this lease shall nevertheless be binding * * * for the longest term for which the parties hereto might lawfully contract."

The record also shows that in various reports to its stockholders Citizens Gas,

through its Secretary and General Manager, made reference to the 99-year lease and to the guarantee of the interest on the Indianapolis Gas bonds.

[3] The admission in the Todd case also revealed that the legislation in question was passed in the "exact form prepared and submitted by said counsel." It appears too that the admission goes only to Chapter 78, but it is obvious that Chapters 77 and 78 go hand in glove. Chapter 77 was made available to cities having a population of not less than 300,000 and Chapter 78 referred only to transferor utility corporations organized prior to 1913.

In fact this legislation expressly authorized the transfer of utility property (held in fee or by virtue of a lease) under circumstances peculiarly similar to the factual situation existing between Citizens Gas, Indianapolis Gas and the City in the instant case. If the legislators had had in mind the exact factual situation here involved, they could not

property as successor trustee of the public charitable trust. Thus in the resolution of March 20 the City resolved that it would take over "all rights, title, interests and ownership, of whatever nature or character * * * transferred or vested in and to said City in * * * the gas plant, mains and property of said Citizens Gas Company by virtue of" (1) the franchise contract of August 25, 1905, (2) the articles of incorporation of Citizens Gas, (3) the conditions stated in the certificates of the owners of the stock, and (4) all "Statutes of this state and other laws relating to the subject matter hereof."

By this same resolution the City directed Citizens Gas to mortgage the property in a sum sufficient to discharge the certificate holders and then demanded Citizens Gas to convey "the plant, property and assets" subject to "such mortgage and other legal obligations against said company." This resolution was served upon Citizens Gas and on April 3, 1929, that company recognized "the trust created by the franchise * * * and by the Articles of Association," acknowledged the right of the city of Indianapolis to take over the property and assets and directed its officers to comply with the resolution.

However, on April 30, 1929, one Newton Todd (certificate holder of Citizens Gas) commenced a suit in the Indiana federal court to enjoin Citizens Gas from conveying its property to the City in the mode proposed in the resolution of March 20. Shortly thereafter a similar action was brought by one Cotter and the cases were tried together. Todd and Cotter claimed that a city purchasing the property of a public utility must comply with the Shively-Spencer Public Utility Act of 1913, that is, it must pay the present day value of the property as determined by the Public Service Commission and obtain the approval of the Commission and city electors.[4] The complaints in the two cases were dismissed for lack of equity, and on appeal the decrees were affirmed. Todd v. Citizens' Gas Co., 7 Cir., 46 F.2d 855, certiorari denied, 283 U.S. 852, 51 S.Ct. 561, 75 L.Ed. 459. The court stated on page 866 that the conveyance in the instant case was not a purchase by the City and that "When they [certificate holders] are paid off, as provided [in the articles of incorporation], their interest [in the gas plant] is at an end."

In leaving the Todd and Cotter cases another admission in the pleadings is to be noted. In the Cotter case the City (a party defendant) admitted the following things in its answer to the complaint: (1) "after the passage of the Shively-Spencer Act of 1913 the Citizens Gas, pursuant to an order of the Public Service Commission of Indiana and with the full consent and approval of the city of Indianapolis, * * * leased from the Indianapolis Gas Company all of its plants and property for a period of ninety-nine years"; and (2) "since 1913 the Citizens Gas Company with full knowledge and consent of the City has operated the combined properties." This then brings us to the Williams case which was filed in 1930 while the Todd and Cotter cases were still pending. See Williams v. Citizens' Gas et al., 206 Ind. 448, 188 N.E. 212.

Williams, an inhabitant and taxpayer of the City, sued as a beneficiary of the public charitable trust (created by the franchise contract of 1905, the articles of incorporation, and the various circumstances

---

have passed more appropriate legalizing and enabling legislation.

The legislation also provided that the question of acquiring such utility property held by virtue of a lease, need not be submitted to a vote of the city electors nor be subjected to the Public Service Commission for approval.

4 Todd and Cotter also urged the following things: (1) the surrender of the franchise in 1921 ended all rights and obligations and thereby relieved the directors and trustees of Citizens Gas from complying with the articles of incorporation (charter) requiring the conveyance to the City; (2) the legalizing legislation of 1929 was contrary to due process of law. The court disposed of the contentions in the following way:

(1) the franchise contract of 1905 was not a contract for a purchase, but an "agreement by which the City obtained an interest in the plant subject to the charge in favor of the certificate holders"; (2) the surrender of the franchise in 1921 did not relieve the directors and trustees from the duty to convey to the City, a duty inscribed in the charter, for the provisions of the charter "were not a part of the * * * franchise * * * and were not affected by the surrender."

The court, however, did not pass on the validity of the legalizing legislation of 1929. Nor did the court discuss whether the leasehold was part of the trust res or whether the particular transfer sought to be enjoined included the property held under the lease.

already related) and the parties defendant were Citizens Gas, Indianapolis Gas, the City and others. The complaint was based on the theory that the trust was adversely affected and slowly being destroyed by complying with the lease in question which Williams alleged was invalid. He alleged that the lease in question was the product of a conspiracy by the officials of Citizens Gas and Indianapolis Gas and by others, and that some of the overt acts of the conspiracy were the following: (1) the procurement of the enactment of the Shively-Spencer Utility Commission Act; (2) the approval of the lease by the Commission; and (3) the surrender by Citizens Gas of its franchise and acceptance of an indeterminate permit.

Demurrers filed to the Williams complaint were sustained and the judgment of dismissal rendered thereon was affirmed on appeal.[5] Williams v. Citizens' Gas Co. et al., supra. As stated by the Indiana Supreme Court, "it appears from the complaint that the lease was one which the Citizens' Gas Company and Indianapolis Gas Company had the power to execute." In passing on, one more thing pertaining to this case may be noted. In the trial court the City (one of the parties defendant) moved to strike out certain parts of the complaint and stated the following in support of its motion: (1) "Inasmuch as said lease was duly approved by the Public Service Commission," its order could not be collaterally attacked; (2) "The lease * * having been validly made, the actions of any individuals leading up to such lease are wholly immaterial"; and (3) "The validity of the public charitable trust set up in the complaint is in no wise affected by the validity of such lease. If the lease is valid the leasehold interest created thereby constitutes a part of the public charitable trust * * *. If * * * the lease is invalid, it would fall without the scope of the trust."

After the resolution of March 20, 1929 came the Todd, Cotter and Williams cases and for five years the history just related

was dragged through the courts. The litigation over, negotiations pertaining to the transfer of the utility property were again resumed. Then on May 7, 1935, the City authorized the issuance of Gas Plant Revenue Bonds in the amount of $8,000,000. See Laws of 1935, Ind., Chap. 311. The bonds were issued to provide funds for the taking over of the utility property "owned by Citizens Gas of Indianapolis and/or in which it has an interest." The bonds themselves recited that the payment of principal and interest was "secured by a charge upon all the revenue from the operation of all of the gas system owned and/or operated by the City of Indianapolis."

After the Revenue Bonds were issued, the City offered them for sale to security brokers and there was made available to bidders a prospectus which described the utility property and its history. This prospectus informed bidders that a public charitable trust existed in the "property of Citizens Gas" and that the City was preparing to acquire and to operate this "utility property in which the City has an interest." It described the gas "system operated by Citizens Gas" as "in part owned by Citizens Gas Company and in part * * * leased by it" for a term of 99 years. The prospectus was worded carefully: although the leased property was included expressly as part of the "system operated by Citizens Gas," it was not included expressly as part of the trust or "utility property in which the City has an interest." The unescapable impression, however, from reading the context of the prospectus is that the leased property was treated as being a part of the utility property subject to the trust.

On July 23, 1935, counsel for the City advised Indianapolis Gas by letter that the City would take over "the property which has been operated by Citizens Gas" but that in acquiring this property it did not become liable for the lease obligations of Citizens Gas under the legalizing legislation of 1929 (already discussed). Counsel also suggested in this letter that "the City * * * is willing to enter into negotiations * * *

---

[5] The complaint in the Williams case relates in detail the history of Citizens Gas and Indianapolis Gas and seeks to show that the 1913 lease was the product of a conspiracy. In affirming the judgment of dismissal the Indiana Supreme Court disposes of four pertinent points in the following way: (1) the Shively-Spencer Act of 1913 is constitutional; (2) Citizens Gas and Indianapolis Gas had the power to execute the lease in question; (3) the action of the Public Service Commission in approving the lease is valid; and (4) the action of Citizens Gas in surrendering its franchise and in accepting the indeterminate permit is valid.

looking toward a revision of this lease to meet the new conditions that will result from municipal operation." By August 27, 1935 counsel for Citizens Gas was also advised that "the City was going to attempt to reject the lease."

On September 9, 1935, Citizens Gas conveyed the entire gas plant operated by it to the City. In return the City had applied around $6,300,000 (part of the proceeds from the sale of the Revenue Bonds) to the retirement of the claims of the certificate holders and bondholders of Citizens Gas, in accordance with the franchise contract and articles of incorporation. In other words, the entire consideration for the transfer was paid to the certificate holders and bondholders of Citizens Gas, and thereafter that corporation had no property and engaged in no business activity. The City did execute an indemnity contract running in the favor of Citizens Gas, however, in which the City agreed to save the corporation harmless from any loss or liability occasioned by the transfer or any action thereafter brought against it.

Thus, on September 9, 1935, Citizens Gas executed and delivered four instruments to the City, which conveyed the entire utility property subject to the legal obligations of the transferring corporation: (1) a deed conveying the real estate; (2) an instrument transferring the personal property; (3) an assignment of a lease covering space in a certain building; and (4) an assignment of the 99-year lease in question. These instruments were received, retained and duly recorded by the City. On the same day the City passed two resolutions: one rejecting the lease and refusing to assume the lease obligations; the other accepting the property held under the lease temporarily and solely to prevent interruption of service.

And on September 9, 1935, the City acquired the utility property of Citizens Gas and assumed operation of the entire gas system including the leased property. On September 30, 1935, Indianapolis Gas notified the City that while it relied on the validity of the lease, it would enter into a stipulation (in the interest of a continued public service) under which the City might continue operation of the plant under the terms of the lease without prejudice to the legal rights of either party.

*Nature of the Trust.* These then are the facts in the instant case and summarizing they spell out the following situation: In the history of the city of Indianapolis certain events and circumstances occurred. These things combined and the result was the creation of a charitable trust for an indefinite and unlimited period of time. Todd v. Citizens' Gas Co. et al., 7 Cir., 46 F.2d 855, 866. The settlors of this trust were specific citizens of the City who subscribed for the capital stock of Citizens Gas, and the cestuis were the gas users of the City. The trust provided for two trustees: (1) the initial trustee, Citizens Gas, a corporate trustee; and (2) the successor trustee, the City, a municipal corporate trustee.

The terms of the trust (the franchise contract and the articles of incorporation) referred generally to the duties of the trustee and the rights of the beneficiaries. Thus the trust provided for a corporate trustee (Citizens Gas) with powers to operate a utility plant for the purpose of supplying the City with light, heat and power. This corporate trustee was to administer the trust until such time as the City exercised its right to succeed to the trusteeship and accepted the trust res. The City was required to exercise its right to succeed as trustee by August 25, 1930.[6]

---

6 According to the franchise contract and articles of incorporation, the City was to declare its intention to take over the trust res at the end of the franchise period (25 years) or sooner, whenever the claims of the certificate holders were satisfied. See footnote 1. Also Todd case, supra, 7 Cir., 46 F.2d at page 866: "The conveyance to the city to be made when the charge in favor of certificate holders was released was a continuance of the trust; the city being the successor in the fiduciary relationship."

In the event that this charge in favor of the certificate holders was not released or that the City failed to accept the trust res, Citizens Gas was to continue operating the plant as trustee. In this regard it is significant to remember that Citizens Gas held an indeterminate permit to operate within the City, subject to the right of the City to succeed to the trusteeship as related above and subject to the right of the City to purchase the plant under Indiana law. Todd case, supra.

It is to be noted too that Citizens Gas had a corporate life of 50 years. This is really immaterial: it is conceivable that at the end of such time corporate rebirth would be in order; at any rate a charitable trust will not ordinarily fail for want of a trustee.

226

Soon Citizens Gas was organized with powers to supply the City with light, heat and power and in accordance with the terms of the trust this corporate trustee proceeded to engage in the utility business. In 1907 it purchased the gas plant property of the old Consumers Gas Trust Company. In 1913 it purchased the leasehold interest in question, that is, it leased the gas plant property of its rival for a term of 99 years. Then it operated the two properties as a unit and controlled the entire gas business of the City. In 1929 the City declared its intention to succeed to the trusteeship. Further action was delayed pending the settlement of interfering litigation. Finally in 1935 the City accepted the property held in fee but rejected the leasehold interest.

What has just been said, reveals the real nature of this public charitable trust. The trust runs for an indefinite and unlimited period of time. Its corporate trustee is given the duty to operate a gas plant under an indeterminable permit, and is instructed to administer the trust for an unlimited period of time subject to the City's power to succeed as trustee. This power to succeed must be exercised by the City within a certain time (25 years) and upon a certain condition (satisfaction of particular claims). Thus this initial trusteeship may be short-lived or it may be coextensive with the life of the corporate trustee.

*Nature of the Lease.* We have related the factual history of the utility business in the city of Indianapolis and have shown that many courts and many parties have concerned themselves therein over one phase or another. And until this litigation was started it appears that every one proceeded on the basis that the lease contract covered a term of 99 years. In this case the argument is advanced that the lease contract is not a 99-year lease at all but that it is one for 99 years or for such shorter time as Citizens Gas might remain as trustee. We are not convinced by the argument made in this regard.

In making this point counsel for the City and for Citizens Gas emphasize Sections 13 and 32 of the lease contract. Section 13 states that certain agreements of the lease (i. e., to secure new franchises and to extend the corporate life of the lessee) are "subject to the rights now held by the city of Indianapolis under the terms of the franchise." Section 32 (see footnote 2) provides against judicial disapproval of the

lease contract because of the length of the term involved. As expressed by counsel for the City, "those who drew the lease intended that Citizens Gas should be bound only for the period of its trusteeship, and that they never intended that the City as successor trustee should be bound."

This construction of the contract lease—that the lease is one for 99 years or for such shorter time as Citizens Gas might remain as trustee—reduces itself to the absurd in light of the real nature of the trust. Our analysis of the trust indicates that the initial trusteeship might well have terminated in 1914 as at any later time. Under such circumstances it becomes inconceivable that "those who drew the lease" intended that the lease ever be for such shorter time. Moreover the granting clause of the lease contract expressly fixes the term at 99 years. To accept counsel's construction in the face of this, is to ignore the plain statement of the granting clause and to change unduly the contractual obligation. We conclude that the lease contract is a 99-year lease.

Nor are Sections 13 and 32 inconsistent with our conclusion. Section 13 treats certain promises of the lessee, e. g., the promise to extend its corporate life, as being subject to the City's "rights." Obvious it is that if the City chooses to succeed as trustee of the trust res or to take over the plant property subject to the "legal obligations" of Citizens Gas (footnote 1), then it is unnecessary to fulfill the certain promises mentioned. In this regard Section 13 does not compel the construction urged that the contractual obligation ends with the initial trusteeship. Moreover it is confined to the promises therein described and wholly fails to refer to the 99-year obligation. At the most Section 13 presents the question whether this obligation is a "legal obligation" (one which Citizens Gas had power to incur), and whether the City takes over the plant property subject to it.

On the other hand Section 32 anticipates a possible judicial determination as to whether a corporation having a life of 50 years has the power to incur an obligation running for 99 years. Surely this section does not require the construction urged by counsel that the contractual obligation ends with the initial trusteeship. At the most Section 32 merely anticipates the question possibly presented by Section 13 and soon to be answered, namely, whether the corporate trustee in the instant case had the

power to incur the 99-year obligation. In passing we repeat that our consideration of Sections 13 and 32 leaves undisturbed our conclusion that the real nature of the contract in question discloses a lease for a term of 99 years.

*Trust Res.* What is the trust res of this particular charitable trust? The answer to this question will dispose of most of the contentions urged by counsel in this appeal. In fact, a consideration of the briefs and the various arguments made therein indicate plainly that counsel disagree seriously in this regard. In essence counsel for Chase and Indianapolis Gas argue in the following vein: the lease is valid and therefore a part of the trust res; it follows that the City may not accept a part of the trust res and refuse to accept another part.

On the other hand counsel for the City states his argument thus: the "City has not, as is asserted, accepted a part of the trust res and refused to accept another part. It has accepted the entire trust res and rejected a lease which the initial trustee had no power to make * * * The trust res was the property and plant of Citizens Gas, and this consisted of the property formerly owned by the Consumers Gas Trust Company."

Moreover counsel for Citizens Gas expresses his argument as follows: "Citizens Gas has never denied its power and authority to bind itself as trustee and the trust property for the term of its trusteeship * * * and this lease would have been binding upon Citizens Gas for the full term of 99 years if it had been permitted to act as a public utility for that length of time * * * the Lease was a binding contract between the parties throughout the term of its trusteeship." In this regard the City in its pleadings conceded "for the purpose of this litigation" that the lease in question, if valid at all, was valid during the trusteeship of Citizens Gas.

That a valid leasehold interest may constitute the subject matter of a trust is not open to dispute, nor do counsel in this case contend differently. If the lease is valid, the rental obligation binds the trust and it matters little that a new trustee succeeds the old one. Otherwise any obligation incurred by a particular trustee would cease with the death, resignation or removal of that trustee: such a rule would lead inevitably to ridiculous results. Therefore, if the lease in question is valid, two conclusions follow: (1) the subject matter of the lease contract is an asset and becomes part of the trust res; (2) the lease obligation binds the trust and is not discharged by a mere substitution of trustees. Earlier in our opinion we have discussed the real nature of the trust and the City's part in the scheme of things; the City is a successor trustee and, as such must accept or disclaim the entire res. We have also discussed the real nature of the lease and its part in the scheme of things: the lease is one for 99 years and if valid the leasehold interest is part of the trust res. We have just related the arguments of counsel which indicate agreement in one regard and disagreement in another. Counsel agree that if the lease is valid, the leasehold interest is part of the trust res. Counsel disagree on the question whether the lease is valid and this we now answer.

Our problem relates to the administration of the trust and particularly concerns itself with the extent of the corporate trustee's powers. Did the trustee have the power to make this lease, i. e., to acquire this leasehold interest and to incur the rental obligation? The rule is that a trustee can properly exercise such powers as are conferred upon him in specific words by the terms of the trust or are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust. We must apply that rule here.

The terms of the trust neither expressly conferred upon nor expressly denied the trustee the power to acquire a non-freehold interest in property. In truth the terms of the trust remain silent on the subject of trustee's powers. The only applicable language relates to duties and not to powers. This language imposes upon the trustee the duty "to supply the City of Indianapolis and its inhabitants with light, heat and power." Plainly the extent of the trustee's powers are measured by the scope of the duty imposed in the terms of the trust, and it is reasonable to conclude that the trustee had the power to secure what utility property was necessary or appropriate to enable it to engage in the gas business and to supply the City with light, heat and power.

Counsel for the City argues but not impressively that the trustee lacked the power to lease the property of its rival because such action might contravene public policy. In this connection it is a fact that Citizens

Gas leased and operated the Indianapolis Gas property for the period of the initial trusteeship. The actual point urged by counsel for the City is that (1) the trustee lacked the power to lease property from anyone for a term of 99 years and that (2) if the trustee had power to lease, it only had power to lease for a term of years not exceeding the initial trusteeship. On this point counsel for Citizens Gas admits that the trustee had power to lease for a term of years not exceeding the initial trusteeship.

Yet we know that the trustee had the power to acquire adequate gas plant equipment. And it is admitted that the freehold estate in the property purchased in 1907 became part of the trust res: the trustee had the power to purchase in fee simple and consequently the freehold estate became trust property. From what has just been said, certain conclusions follow as a matter of logic: (1) the trustee had the power to purchase the Indianapolis Gas property in 1907 or in 1913; and (2) the trustee had the power to lease this property in 1907 and 1913 for a term of years not exceeding the initial trusteeship. In situation (1) the property would have become a permanent part of the trust res. In situation (2) the property would have become a temporary part of the trust res.

Thus counsel's argument that the trustee lacked the power to make this particular lease, narrows to an attack on the *mode* of the acquisition of the property. In view of the circumstances counsel can not argue, nor does he argue, that the trustee lacked the power to acquire the property in question: manifestly the trustee had the power to acquire either a freehold or a nonfreehold interest in the property. His argument condemns the acquisition in 1913 because of the duration of the term. In effect counsel states that the trustee had power to acquire property but no power to acquire it for a term of 99 years or for any term of years exceeding any particular trusteeship.

Counsel relies considerably on the leading case of In re Hubbell Trust, 135 Iowa 637, 113 N.W. 512, 13 L.R.A.,N.S., 496, 14 Ann. Cas. 640, as expressing judicial disapproval of long-term leases. In that case the private trust had a probable duration of 71 years and the trustee (an individual) leased the trust property to others for a term of 99 years. The court disapproved of the long-term lease because the duration of the lease exceeded the period of the trust and hence incumbered the rights of the remainderman. The court laid down several rules for the guidance of trustees (135 Iowa 637, 113 N.W. at page 522, 13 L.R.A.,N.S., 496, 14 Ann.Cas. 640): "(1) The trustees may lease for such reasonable terms as are customary * * *. (2) Such terms should not, save on showing of reasonable necessity * * *, extend beyond the period the trust is likely to continue. (3) Should they extend unreasonably beyond such period, the excess only will be void. * * * *"

We believe that the Hubbell Trust case is a well-reasoned one but it does not support counsel's argument that the trustee did not have the power exercised in 1913. The Hubbell Trust case does not stand for the proposition that a trustee has no power to lease for a term of years. At the most it stands for the rule that a trustee has no power to lease trust property for a term of years exceeding the period of the trust. It does not take much comparison to see that such a rule does not support the proposition here urged, namely, that the trustee lacked the power to lease beyond its period of trusteeship.

Moreover in the instant case the trustee's power to acquire a long-term leasehold interest is in issue, not the trustee's power to lease trust property for a long term of years. Yet even if applicable, and we believe the Hubbell Trust Case is analogous, the trustee in our case did not lease for a term of years exceeding the period of the trust. In fact the court in the Hubbell Trust case recognized that charitable trusts were to be treated differently than private trusts in this regard, for it said, 135 Iowa 637, 113 N.W. on page 522, 13 L.R.A.,N.S., 496, 14 Ann.Cas. 640, that "the decisions with reference to charitable trusts afford no aid, for the trust period in these is indeterminable, and the length of the lease is considered only as bearing upon the reasonableness of its provisions and of the rentals stipulated. Such leases have been approved where otherwise reasonable with terms varying from 80 to 1,000 years. See * * * City of Richmond v. Davis, 103 Ind. 449, 3 N.E. 130 [other cases cited]."

Thus counsel's argument that the trustee lacks the power to lease this property because the duration of the lease exceeded the trusteeship (or even the trustee's life), has no real foundation in the law. Obviously the principle of law that a trustee has no power to lease where the term of years

exceeds the period of the trust, has no application here. In the end our case is this: under the terms of the lease the trustee had the power to acquire certain property; the power of acquisition might well have assumed at least two forms—acquisition by outright purchase or by long-term lease; the trustee selected the latter mode of acquisition. Selecting one mode of acquisition rather than the other does not alter the situation: the trustee had the power to acquire.

■ However, another point arises where as here the trustee has the power to make leases. In making a long-term lease a trustee is under a duty to act with prudence. If a trustee makes a lease which is unreasonable under the circumstances, he thereby commits a breach of trust. For this a trustee incurs liability to the beneficiaries who in addition may have such a lease set aside. This record discloses that the trustee was justified in selecting the mode of acquisition which it did. When the prudence point was urged before the Indiana Supreme Court, that court did not find the lease in question unreasonable as to time or as to its other terms. Williams v. Citizens' Gas Co. et al., 206 Ind. 448, 458, 460, 188 N.E. 212.

■ We therefore conclude that the trustee had the power to make the long-term lease in question and that this particular leasehold interest in the Indianapolis Gas property is part of the trust res. In passing it might be said that the few cases discussed in the opinion above are determinative of the immediate issue here, i. e., as to the validity of the 99-year lease. See in particular Fishback v. Public Service Commission et al., 193 Ind. 282, 138 N.E. 346, 139 N.E. 449; Williams v. Citizens' Gas Co. et al., 206 Ind. 448, 188 N.E. 212; Todd v. Citizens' Gas Co. et al., 7 Cir., 46 F.2d 855; Chase Nat. Bank v. Citizens Gas Co. et al., 7 Cir., 96 F.2d 363, 365. No amount of verbal magic resorted to by counsel for the City will avail to brush aside the barrier these cases present to him. Nor have we overlooked the various admissions and apparent inconsistencies of the City during the history of this gas utility controversy in the courts and before the administrative bodies, but these points we find unnecessary to the decision herein reached.

■ *Successor Trustee.* In this case the City declared its intention to succeed as trustee and to accept the trust. Then it proceeded to accept the property held in fee and to disclaim the property held under the lease. We have shown that the predecessor trustee had the power to acquire the properties in question and that upon acquisition these properties became the subject matter of the trust. The facts show that the gas plant is operated as a unit and that the continued operation of both properties is necessary in order to prevent disruption of service to gas consumers.

Thus we have a case where the successor trustee accepts the office of trustee but purports to accept the trust only as to a part of the trust property or only as to some of the duties. This cannot be done. We have shown that the trust res consists of the two properties described. This is not a case of two separate and distinct trusts, one as to a freehold interest in property, the other as to a nonfreehold interest in property. We conclude that acceptance of the office of successor trustee and of part of the trust, operates as an acceptance of the whole trust. The City takes the trust property subject to the lease obligation incurred by Citizens Gas.

*Form of Relief.* Counsel for Indianapolis Gas contends that the instant suit was one asking for a declaration of rights and that hence the District Court erred in granting both declaratory and coercive relief. The original bill of complaint alleged facts relating to the history of this utility controversy, describing the escrow arrangement between the City and Indianapolis Gas in 1936 whereby a sum equal to the rentals under the lease would be deposited with an escrowee, and indicating the probable effect of these events on Chase's rights to the payment of bond principal and interest coupons. The prayer sought a declaratory judgment concerning the validity of the lease and a "judgment * * * in the amount of all unpaid interest payable under said lease." At the time of this complaint no interest coupons were yet due. Later a supplementary bill was filed, which set up subsequently occurring facts showing default as to interest coupons and which prayed a coercive judgment in the amount of the unpaid coupons.

These pleadings reveal that the pleader joined claims for a declaration of rights and claims for personal coercive relief, and that the pleader requested a declaration as to the validity of the lease and a coercive form of relief as to the unpaid coupons and interest thereon. The lease

and coupon claims arose out of the same factual background and represented the aftermath of the instant utility controversy. The supplemental pleading merely presented subsequent matter already related to the claims as presented in the original pleading. See Texarkana v. Arkansas Louisiana Gas Co., 306 U.S. 188, 203, 59 S.Ct. 448, 83 L.Ed. 598; Rule 15 (d), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Nor does counsel urge that the handling together of these claims interfered with trial convenience.

■ The District Court did not err in treating the complaint as above stated and in deciding the issues thus presented. Such a procedure is proper under the Federal Declaratory Judgments Act and the Federal Rules of Civil Procedure. 28 U.S.C. Sec. 400, 28 U.S.C.A. § 400; Federal Rules 18, 54, 57; see, also, Borchard, Declaratory Judgments (1934), pp. 175, 176. Counsel relies on Brindley v. Meara, 209 Ind. 144, 198 N.E. 301, 101 A.L.R. 682, where the Indiana Supreme Court interpreted the Indiana Declaratory Judgments Act, Acts Ind.1927, c. 81. This decision can not bind us in our interpretation of the Federal Declaratory Judgments Act, even if it could be said to be inconsistent with the position we take here.

■ It is not improper for a pleader under the Federal Rules of Civil Procedure to combine in one complaint a request for a declaration and for some coercive relief. Nor is it improper for the District Court to render a judgment or judgments granting both forms of relief. Our conclusion in this regard is not at variance with anything said by the United States Supreme Court in the following cases, as counsel would have us believe. Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191; Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Perkins v. Elg, 307 U.S. 325, 349, 59 S.Ct. 884, 83 L.Ed. 1320.

*Chase's Authority to Sue.* In this case Indianapolis Gas issued bonds payable to bearer. To secure the payment of principal and interest thereon, Indianapolis Gas mortgaged its property to certain trustees in behalf of the many bond purchasers. Chase is now the sole trustee and is here suing for the benefit of the bondholders. Chase's authority to bring this suit is derived from the mortgage deed of trust (or Indenture of Mortgage) executed by In-

dianapolis Gas and the certain trustees. Our immediate task is to measure the extent of Chase's powers to sue in behalf of the bondholders.

Each bond provided for the payment of $1,000 principal in a certain future year and the payment of 5% interest per annum. Payment of the interest was to be made at the office of the trustee of the mortgage deed of trust upon the presentation and surrender of the interest coupons. Each bond also provided for an acceleration clause in case of interest default, subject to the conditions of the mortgage deed of trust. In addition each bond provided that it had been issued by Indianapolis Gas "under and in accordance with the terms and conditions" of the mortgage deed of trust (Indenture of Mortgage).

Among other things the mortgage deed of trust provided in Section IX that Indianapolis Gas "agrees to and with" the trustee to "pay the principal and interest of and upon the bonds * * * as the same shall become due and payable" and that upon any "default in the due performance of this covenant" due presentment and demand for payment of the "bonds and coupons" is waived. Section XIV then provided that the "right of action under this indenture is vested exclusively in the Trustees, and under no circumstances shall any bondholder or bondholders have any right to institute an action * * * for the purpose of enforcing any right herein and hereby provided, or of foreclosing this mortgage, * * * and all actions and proceedings for the purpose of enforcing the provisions of this indenture shall be instituted and conducted by the Trustees according to their sound discretion."

■ An intelligent reading of the mortgage deed of trust, properly incorporated by reference in each bond sold, is sufficient to dispose of counsel's argument that Chase is without authority to sue for the unpaid interest coupons. The two sections stated above expressly give Chase as trustee the power to recover judgment for either principal or interest in default. Of course the trustee holds the judgment or its money equivalent for the benefit of the bondholders. That a trustee has the right to enforce the provisions of a mortgage where as here the mortgagor has made an express promise to the trustee that it will pay the principal and interest, is recognized. See Carey v. Brown, 92 U.S. 171, 172, 23 L.Ed. 469; New York Trust Co. v.

Michigan Traction Co., D.C., 193 F. 175, 180; First Nat. Bank & Trust Co. v. Dolph, 287 Mich. 219, 283 N.W. 35, 38.

We conclude therefore that Chase was authorized to sue for the default in the payment of interest coupons and that the judgment in its favor as trustee for the benefit of the bondholders was proper. Counsel also objects to the judgment on the following grounds: (1) the original interest coupons (best evidence) were not produced or read in evidence; (2) the judgment failed to provide that the trustee pay over recovered sums to bondholders only upon the surrender and cancellation of the coupons; and (3) the maker of the bonds owned part of them. Assuming the truth of these objections would not compel reversal, for the objections are not substantial in character.

As for objection (1), a copy of the mortgage (the mortgage deed of trust) was attached to the complaint and this included the form of each bond and coupon held by bondholders. Furthermore, the parties by express stipulation waived any necessity for producing the original of each bond or coupon in evidence. As for objection (2), the bond itself provides that coupons are payable only upon presentation and surrender of the coupons. As for objection (3), the basis thereof was stipulated to be so by the parties, yet counsel waited to urge the objection at this time. These objections, urged for the first time, are technical at the most and merit no further consideration.

*Right to Interest on Interest.* Our case is one where the bonds in question incorporate by reference the provisions of the mortgage deed of trust. Our case is also one where the trustee for the bondholders was authorized to sue on the bonds in order to enforce (1) the covenant to pay the interest coupons or (2) the covenant to pay the principal. Had the trustee elected to enforce covenant (2), it would have had the concomitant power under Section III of the mortgage deed of trust to foreclose the mortgaged property (the security) and to collect the proceeds from the sale thereof. The trustee, however, elected to enforce covenant (1). See New York Trust Co. v. Michigan Traction Co., D.C., 193 F. 175, 180.

Now the usual rule in these matters is to allow interest on the unpaid interest coupons after default. City of Jeffersonville v. Patterson, 26 Ind. 15, 16, 89 Am.Dec. 448; Gelpcke v. Dubuque, 68 U.S. 175, 206, 1 Wall. 175, 17 L.Ed. 520. Yet the District Court denied this claim to interest on the interest coupons from the date of maturity to the date of the judgment. Necessarily the rule applies, unless the bonds themselves or the mortgage deed of trust incorporated by reference therein qualify this right to interest on interest. The District Court pointed to Section III of the mortgage deed of trust as limiting the right to interest on the unpaid interest coupons. That section relates that after a foreclosure and sale by the trustee for the bondholders, the proceeds shall be applied first "to the payment of interest on said bonds * * * but without interest upon such interest" and then to the payment of the principal on the bonds.

But in the instant case the trustee did not elect to enforce covenant (2) above, that is, the trustee for the bondholders is not seeking here to foreclose the mortgaged property and to collect the proceeds from the sale thereof. Instead the trustee has elected to enforce covenant (1), that is, it seeks here to recover the unpaid interest coupons in default. Obviously the limitation contained in Section III is not applicable. Nor should it be assumed that the right to interest upon enforcing covenant (1) can not be more extensive than the right to interest upon enforcing covenant (2). The covenants are independent. As to one there is a limitation. It does not follow at all that as to the other a similar limitation is implied. We conclude that the judgment should have included interest on the unpaid coupons from the date of maturity to the date of the judgment.

*Rate of Interest.* According to the case and statutory law of Indiana, if an obligation bears a specific rate of interest (the contract rate), then the obligation will continue to bear interest at the contract rate after maturity and the judgment thereon will bear interest at the same rate. On the other hand, if there is no contract rate, the rate is the statutory 6%, both as to the obligation after maturity and as to the judgment thereon. See Shaw v. Rigby, 84 Ind. 375, 43 Am.Rep. 96; Kerr v. Haverstick, 94 Ind. 178; Gale v. Corey, 112 Ind. 39, 13 N.E. 108, 14 N.E. 362; 5 Burns' Indiana Statutes Annotated 1933, Secs. 19-2002 and 19-2003.

It is Chase's contention that in applying the Indiana law in this matter, these re-

sults follow: (1) as to the bonds, the contract rate is 5%, and therefore after maturity the bonds will bear interest at 5% and any judgment for the principal will also bear interest at 5%; (2) as to the amount due on the coupons, there is no contract rate specified but instead there is a direct promise to "pay to the bearer * * Twenty-five dollars * * *" at a specified date, and therefore the rate of interest on the coupons after maturity is 6% and the rate of interest on the judgment for the overdue and unpaid coupons is also 6%.

We disagree with Chase when it contends that there is no rate of interest specified on the coupons. In describing the coupons above, Chase omits the following significant words: "being six months' interest on its First Consolidated Mortgage *Five Per Cent.* Gold Bond No.————." Moreover the face of each bond reads as follows: "The Indianapolis Gas Company * * * promises to pay * * [the principal] * * * with interest * * * at the rate of five percent. per annum * * *; that is to say, on the first day of April and of October * * * upon the presentation and surrender of the *annexed coupons* respectively." (The italics is our contribution.) We conclude that the unpaid interest coupons bear interest at 5% (the contract rate) from the date of maturity to the judgment and that the judgment for the overdue and unpaid coupons also bears interest at 5% until the same is satisfied.

*Liability of Citizens Gas.* We have considered the complete argument made by counsel for Citizens Gas and conclude without further discussion that its liability under the lease continues but that its liability is secondary to the liability of the City as successor trustee and to the liability of the trust property. We have also concluded that the indemnity contract executed by the City and running in favor of Citizens Gas, is valid and effective. In passing it is to be noted that the lease obligation carries with it the payment as rental of the interest on the bonds of Indianapolis Gas.

*Conclusions.* Our conclusions in this case follow: (1) the 99-year lease is valid; (2) the assignment of the lease did not relieve Citizens Gas from its obligations as lessee; (3) the indemnity contract is effective; (4) the lease binds the City as successor trustee and the trust property; (5) the leasehold interest is part of the trust res; (6) the City has accepted the trust res; (7) Chase has a right to interest; (8) Chase has a right to interest on interest; and (9) Chase is entitled to interest at the rate of 5%.

Therefore the judgment of the District Court is reversed, Chase is entitled to a declaratory judgment to the effect that the lease is valid and enforceable against the parties in the following order of liability: (1) the City as successor trustee and the trust property; and (2) Citizens Gas. Chase is also entitled to a coercive judgment for the unpaid and overdue interest coupons, the judgment to include interest at 5% both on the coupons from maturity to the judgment and on the judgment from entry to satisfaction. Moreover, this coercive judgment is enforceable against the parties in the following order of liability: (1) the City as successor trustee and the trust property; (2) Citizens Gas; and (3) Indianapolis Gas. The District Court is directed to proceed in accord with this opinion. It is so ordered.